LAND, Justice.
 

 The defendants, Ralph Eisenhardt and Gladstone James, are jointly indicted for the murder of Vincent Bologna in the parish of Jefferson, on or about March 30, 1935. Defendants were tried by jury, found guilty as charged, and each of the defendants was sentenced to be hanged. From the conviction and sentence, both defendants have appealed.
 

 The appeal of James is based on eight bills of exceptions, and the appeal of Eisenhardt upon seven hills of exceptions.
 

 As in most instances, both defendants have taken bills on the same point, we find it convenient to cover the points raised in these bills in one discussion.
 

 These dual or joint bills are as follows:
 

 No. 1. Complaint that the witnesses to the jury drawing were not properly summoned.
 

 No. 2. Complaint that the members of the grand jury were not drawn from the panel by lot.
 

 No. 3. Objection to admission of confessions, as not signed by accused, and as not voluntary.
 

 No. 4. Complaint as to the exclusion of certain evidence regarding each defendant’s condition at the time of the taking of the confessions in the Gretna jail.
 

 No. 5. (Eisenhardt); No. 7. (James). Objection that the district attorney’s desk was located too close to the jury box.
 

 After discussing in this opinion the above five joint or dual bills, we will review bills No. 5, No. 6, and No. 8, independently reserved by the defendant James; and bills No. 6 and No. 7, independently reserved by the defendant Eisenhardt.
 

 Joint Bills
 

 (Bill No. 1 by James, and Bill’ No. 1 by Eisenhardt)
 

 The two defendants filed motions to quash the jury venire, James, T. p. 4, and Eisenhardt, T. p. 79, on the grounds :
 

 (1) That the jury commissioners had not taken the constitutional oath of office.
 

 (2) That the general venire of jurors, from which the grand jury had been selected, was drawn in violation of law, particularly of articles 178 and 179 of the Code of Criminal Procedure.
 

 (1) The first ground of defendants’ motions to quash the venire apparently has been abandoned. The point is not raised in the revised motion of defendant James to quash the jury venire, annexed to his bill of exceptions No. 1, T. p. 28; nor is it mentioned in bill of exceptions No. 1 of
 

 
 *315
 
 either defendant, T. 27, 95; nor is it referred to in the brief of defendant James.
 

 (2) As to the'second ground of defendants’ motion to quash the jury venire, it is provided in article 178 of the Code of Criminal Procedure that: “To be competent, any witness to any of the proceedings of any jury commission shall be disinterested, shall be a resident of the parish and not less than twenty-one years of age, shall be competent to read and write the English language
 
 and shall be specially summoned by the clerk
 
 as a witness to said proceeding.” (Italics ours.)
 

 The irregularity complained of by defendants is that the clerk did not
 
 formally
 
 subposna the two or more witnesses to the jury drawing, but merely
 
 called them from the bystanders.
 

 No contention was made by defendants that the witnesses were incompetent, or that anything else was wrong with the proceeding.
 

 It is specifically provided in article 203 of the Code of Criminal Procedure that: “It shall not be sufficient cause to challenge the venire selected for any session of the court or portion thereof or for service at any time in any parish or district of this State, or to set aside the venire, because some of the jurors on the list are not qualified to act, nor because of any other defect or irregularity in the manner of selecting the jury, or in the composition, summoning or proceedings of the Jury Commission, unless
 
 some fraud
 
 has been practiced
 
 or some great wrong
 
 committed that would work irreparable injury; provided, that it shall be good ground to challenge, for cause, any juror who is not qualified by law to act.” (Italics ours.)
 

 The previous laws on the subject of witnesses to the proceedings of the jury commission required that they “shall be summoned by the clerk
 
 for that purpose.”
 
 Act No. 135 of 1898, § 4, and Act No. 58 of 1904.
 

 In interpreting Act No. 135 of 1898, the Supreme Court of this state passed upon an objection that
 
 no written summons
 
 had issued to the witnesses called for a jury drawing in the parish of Franklin, and disposed of the objection by saying: “Even should a
 
 written summons be necessary,
 
 the mere omission to issue such summons could not possibly operate as a fraud against, or great wrong to the defendant. At best, it would be a harmless irregularity, as the statute in this respect is directory.” (Italics ours.) State v. Davis, 154 La. 295, 303, 97 So. 449, 451.
 

 The motions of the two defendants to quash the jury venire were properly overruled by the trial judge.
 

 Joint Bills
 

 (Bill No. 2 by James, Bill No. 2 by Eisenhardt)
 

 The motions of the two defendants to quash the indictment are found at page
 
 2
 
 and page 77 of the Transcript and are based on the grounds:
 

 (1) That the grand jury was not drawn according to law, particularly article 184 of the Code of Criminal Procedure.
 

 
 *317
 
 (2) That the trial judge did not sign or approve the minutes of the court containing the order assembling the grand jury which returned the indictment in this case,
 

 The second ground of the motion to quash the indictment is noticed, neither in the bills of exceptions, T. 31, and 97, nor in the brief of defendant James, and has apparently been abandoned.
 

 As to the first ground of the motion to quash, the specific complaint of defendants is that the grand jury was not drawn
 
 by lot.
 

 Article 184 of the Code of Criminal Procedure provides that: “As soon as practicable after the selection by the commission of the list of grand jurors, the grand jury shall be impaneled. The judge shall select from the list of grand jurors a suitable person to act as foreman of the grand jury, and the sheriff, under the direction of the court,
 
 shall draw by lot
 
 from the envelope indorsed 'list of Grand Jurors,’ the names therein until eleven answer, who, with said foreman, shall constitute the grand jury. The names remaining in the envelope, after completing the panel of the grand jury, shall be replaced in the jury box, to be drawn from by lot in case any vacancy shall occur thereafter in the membership of that body; provided that should the original list be exhausted before the panel is completed or by the completion of the panel, the judge shall direct the commission to select from the jury list and to withdraw from the general venire box an additional number of names to complete said panel or to fill vacancies that have taken place in the grand jury since exhausting the panel; provided, further, that in the absence of the foreman, the judge shall appoint an acting foreman from the grand jurors present.”
 

 On the trial of defendants’ motion to quash the indictment, the following minutes of the court were produced, Transcript, p. 34:
 

 “The names of the persons from which the Grand Jury is to be drawn who are summoned to be present in the Court this day were called and answered to their names as per roll book:
 

 “The Court then appointed Jules Le Blanc, Foreman of the Grand Jury who was duly sworn together with the following named parties and constitute the Grand Jury to serve during the following six (6) months as required by law, namely:
 

 1. Jules Le Blanc, foreman.
 
 2.
 
 John Coot.
 

 3. D. W. Eastman, 4. Wm. Hitch,
 

 5. Octave Tassin, 6. Wm. Maus,
 

 7. John Cambre, 8. Santo Yicari,
 

 9. W. C. Rumsley, 10. M. M. Pitre,
 

 11. Julius Breeder, 12. Alphonse Leson.
 

 “After each and every one of the jurors were sworn, and after a charge delivered to them by the Court, the jury retired to their room to deliberate upon the matters to be submitted to them and all as according to law.”
 

 The contention of counsel for defendants, on the trial of the motion to quash, that the above minutes did not expressly recite that the sheriff
 
 had drawn by lot from the envelope
 
 the eleven above-named jurors, was met by the state by calling as a witness Deputy Sheriff Dauenhauer. He testified that he had actually drawn the
 
 *319
 
 eleven grand jurors by lot from a box, into which the names in the grand jury envelope had been emptied for such purpose of the drawing, as was the custom of the court. His testimony is not contradicted in any way. The trial judge thereupon overruled defendants’ contention that the grand jurors had not been drawn by lot.
 

 The contention in the bills reserved by defendants, that the testimony of Deputy Sheriff Dauenhauer “was an attempt to impeach and controvert the written record of the minutes of this Court,” is without merit.
 

 This was a proceeding, had contradic■torily with defendants, in which the minutes of the court were corrected so as to make them conform to the true facts of the case.
 

 This court has repeatedly held that at any time, either before or after an appeal in a criminal case, the trial court may, in a proceeding taken contradictorily with a defendant, correct and amend its minutes so as to present the true facts for the consideration of the appellate court. State v. Posey, 105 La. 350, 351, 29 So. 897; State v. Daniels, 49 La.Ann. 954, 22 So. 415; State v. Moise, 48 La.Ann. 109, 18 So. 943, 35 L.R.A. 701; State v. Bouline, 107 La. 454, 31 So. 885; State v. Revells, 31 La.Ann. 387; State v. Judge, 31 La.Ann. 557; State v. Tessier, 32 La.Ann. 1227; State v. Perry, 51 La.Ann. 1074, 25 So. 944.
 

 The testimony of the deputy sheriff who conducted the drawing was fully competent to supply the omission in the clerk’s minutes, and to clear up the fact in dispute.
 

 The motion to quash the indictment was properly overruled.
 

 Joint Bills
 

 (Bill No. 3 by James, Bill No. 3 by , Eisenhardt)
 

 These bills resulted from the ruling of the trial judge admitting in evidence the confessions of the two defendants, James and Eisenhardt.
 

 The evidence as to these confessions is referred to in the respective bills of exceptions as: “Certain questions and answers written by Ernest Conzelmann, assistant district attorney, alleged to have been taken from the defendant (naming each defendant in his own bill of exception) by the said Conzelmann, in the Jefferson Parish Jail on the night of April 7th, 1935, between 6:00 o’clock P. M. and 9:00 o’clock P. M. as a confession on the part of the said (naming each defendant in his own bill of exception).”
 

 Bills of exceptions No. 3 set forth that the defendants’ objections to “the introduction of any such questions and answers purporting to be a confession” were as follows:
 

 (1) For the reason that said purported questions and answers had not been signed by the defendants, and had been transcribed from' shorthand notes outside of the defendants’ presence and at no time verified by them. •
 

 (2) For .the reason that the said alleged confessions were not free and voluntary, but were obtained by force, duress, fear, and violence, all as shown by the steno
 
 *321
 
 graphic record taken on the laying of the foundation for the confessions. This evidence, for and against the admission of the confessions, given out of the jury’s presence, was taken down by a stenographer and is found in the Transcript, pp. 145 and 240, inclusive.
 

 None of this testimony was heard by the jury, and none of the testimony heard by the jury was taken down by a stenographer, and that evidence, therefore, does not appear in the record.
 

 The confessions were proven by the testimony of Mr. Conzelmann, assistant district attorney, and also by the testimony of Mr. Fleury, the district attorney, and several other persons present at the time, rather than by the documents themselves.
 

 At the time of the taking of the confessions, Mr. Conzelmann, who is a stenographer, kept a shorthand record in combined narrative and dialogue form. These shorthand notes he transcribed on the typewriter next morning.
 

 When he was called to the witness stand, he undertook to relate the details of the confessions, refreshing his memory from and necessarily following the narrative of the transcription of his shorthand notes. See testimony of Conzelmann, beginning at page 146 of the Transcript.
 

 Shortly after Mr. Conzelmann began to testify the jury was withdrawn. T. p. 149.
 

 The state then undertook, out of the presence of the jury, to lay the foundation for the introduction of the confessions by Mr. Conzelmann, Mr. Fleury, and various other witnesses; and the defendants offered testimony of several.witnesses in opposition.
 

 After the trial judge heard all the testi•mony, for and against the admission of the confessions, and had ruled that Mr. Conzelmann should be allowed to testify as to the statements made to him by the two accused, the state put Mr. Conzelmann back on the witness stand and had him produce and identify the sheets of his shorthand notes, A to G, and the sheets of his original typewritten transcript of those notes, H to R. T. 240; 196 and 197.
 

 Counsel for state then moved: “In connection with the laying of the foundation only, and not in connection with the record of the notes, itself, until such time as the confessions are declared admissible by the court, and merely for the purpose of completing the record of the foundation in case of any appellate action, we now ask leave to file for that limited purpose, and make part of this transcript, solely for the laying of the foundation for the introduction of the confession, these exhibits A to R, both inclusive.”
 

 To which defense attorney, Mr. Dowling, said: “For that restricted purpose, we have no objection.” T. 197.
 

 The jury was then recalled, and Mr. Conzelmann, without the court stenographer any further, testified verbally from his records regarding the confession. But the documents from which he refreshed his memory were never offered in evidence, or
 
 *323
 
 treated before the jury in the nature of written confessions.
 

 The contention, therefore, of defendants that these documents had not been signed or verified by them is without merit.
 

 There is no rule in this state requiring the signing of a confession by the accused.
 

 “A confession is the voluntary declaration made by a person who has committed a crime or misdemeanor, to another, acknowledging his agency or participation in same. * * * A confession may be either express or implied. It may be a naked statement by defendant that he is guilty of the crime, or it may be a full statement of the circumstances of its commission, inr eluding his part in it. Also it may be in the form of a letter or of several letters to different persons, or may consist of detached conversations with many people, or it may be a formal confession, or all of these together.” 16 Corpus Juris, 715, verbo “Criminal Law,” and authorities cited in foot-notes.
 

 The second objection under bills No. 3 attacks the voluntary character of the confessions made to Mr. Conzelmann by Eisenhardt and James, and presents for review by us the decision of the trial judge that the foundation for the admission of these confessions had been properly laid, their voluntary character shown, and that Mr. Conzelmann should be permitted to testify regarding them before the jury.
 

 Hon. J. E. Fleury is district attorney for the parish of Jefferson, and E. M. Conzelmann is his assistant.
 

 Vincent Bologna was murdered on Saturday night, March 30, 1935, in the parish of Jefferson.
 

 In the investigation of this crime, the assistant district attorney, on Sunday, April 7, 1935, at about 5 :30 o’clock in the afternoon, interviewed defendants, Eisenhardt and James, separately and together, in the jailer’s room in the parish prison at Gretna.
 

 Defendants, separately and together, made statements to the assistant district attorney, who testified that no promises of any kind were made; that no threats were used; that no inducements were offered; and that these statements were free and voluntary. T. 147.
 

 When these statements were made, there were present the district attorney and his assistant, Peter Leson, Beauregard Miller, and Theo. Leinhart. After talking to James about fifteen minutes, the assistant district attorney had Eisenhardt brought into the room.
 

 After the assistant district attorney arrived at the jail, and had been there about an hour, James’ aunt, his sister, and her husband, accompanied by Carl Conrad, attorney for James, called at the jail to see James, and the assistant district attorney excused himself and permitted them to go into the jailer’s room and converse with James, while the assistant district attorney remained outside, and Eisenhardt was removed from the room. T. 149, 151.
 

 The assistant district attorney testified that he talked to both of them in a quiet, friendly way; that neither appeared to be excited, but both were in a normal condi-
 

 
 *325
 
 tion; that neither complained about any ill treatment by any one in the Jefferson parish jail; that neither complained of being subjected to any ill treatment anywhere else; and that neither appeared to he laboring under any fear or duress as the result of ill treatment by anybody else. T. 150, 151.
 

 James was left in the room with his relatives and his attorney about three-quarters of an hour. Neither the relatives, nor his attorney, made any complaint to the assistant district attorney of the treatment that was being accorded to James in the Jefferson parish jail; nor did the relatives, or his attorney, make any complaint or objection to the assistant district attorney resuming his interview with James. T. 152.
 

 The relatives of James, and his attorney, were aware that the assistant district attorney was talking to James, as they found him there with James when they arrived.
 

 After the visitors departed, the assistant district attorney resumed his conversation with James alone for a while, and then called Eisenhardt back, and continued to talk to them until the district attorney arrived about 7 or 7:30 o’clock and took charge of the interview. T. 152.
 

 The district attorney testified that he proceeded to talk to the defendants; that they asked us if we would allow them to stay in the room together for a few minutes; that they wanted to discuss the matter, and they would probably decide as to whether they would make a statement or not; that defendants were left in a room and, in about five or ten minutes, sent word for us to come in; that we came back into the room, and they proceeded to make statements, and there were questions asked and they answered the questions. T. 162.
 

 As to the normal condition of the defendants at the time, the district attorney testified as follows:
 

 “Q. At any time during this interview, did either of these defendants appear to be laboring under any excitement?
 

 “A. On the contrary, they weren’t laboring under any excitement. They laughed and joked between themselves at times.
 

 “Q. Did they express any fear of anybody?
 

 “A. None whatever.
 

 “Q. Did they make any suggestion that caused you to tell them that no promises would be made?
 

 “A. They at times asked Certain things. Do you want me to tell you what they asked about ?
 

 “Q. Yes, go ahead.
 

 “A. They wanted to know if they could not get a plea of guilty without capital punishment to save their necks, and they were told positively and unequivocally that no promises would be made to them.
 

 “Q. Were they given the alternative of talking if they pleased, and refusing to talk, if they pleased ?
 

 “A. Positively.” T. 162.
 

 The state placed on the witness stand every person who was present at the time of the taking of the confessions by Mr.
 
 *327
 
 Conzelmann and Mr. Fleury, and all the witnesses testified to the voluntary manner of those confessions.
 

 There is nothing in the record to show that any improper influence was used upon these defendants to procure confessions, either at the time of the interview between Eisenhardt and James and Mr. Fleury and Mr. Conzelmann in the Gretna jail, or at any other time since the defendants had arrived in Gretna about 10 o’clock Saturday night, April 6, 1935.
 

 On the contrary, there was every showing of free and voluntary confessions, and the trial judge so ruled.
 

 Defendants, however, have attempted to show that, at least twenty hours before, they had been influenced to give previous confessions by the New Orleans police, relying upon the rule.of law that where the previous confession has been given under duress the presumption is that a subsequent confession flows from the same influence. However, this is a rebuttable presumption, which, in our opinion, has become fully overcome by the clear showing that the subsequent confessions were entirely free and voluntary.
 

 The defendant Eisenhardt, who had been arrested Friday afternoon and placed in the First precinct station over night, did not take the witness stand, and either deny his guilt or claim that his confession to Mr. Conzelmann was false and improperly obtained, or that he had been subjected to any improper treatment by Mr. Conzelmann or Mr. Fleury on April 7th, or by anybody else at any other time previously. The testimony of the defendant James, that he was subjected to ill treatment while he was at the New Orleans police headquarters, is positively contradicted by the testimony of Chief Miller and Officer Leinhart that they were at all times present with him while he was at the New Orleans police headquarters and that no person had ill treated him in any way, and that, immediately after transcribing and signing his confession, he was returned to the jail in Gretna. James was in New Orleans only from about 3 o’clock Saturday afternoon to about 10 o’clock Saturday night. He was not locked up at all. T. 172, 173, 174, 175, 193.
 

 The fact is that Pumilia, who is jointly indicted with these two defendants, but is not now on trial, was at the New Orleans police headquarters. All of the defendants were being questioned there alternately. When something was found out from one of them, they brought the other one in, and in this way got the pieces of the whole story.- See Leinhart’s Testimony, p. 186.
 

 No complaint of ill treatment was made to the Gretna officers by either of the defendants when they were transferred from the New Orleans police headquarters to the Gretna jail.
 

 The First precinct station in New Orleans is customarily used to lock up over night prisoners who violate misdemeanor laws. See Chief Beauregard Miller’s Testimony, T. p. 176.
 

 In the transcript the transcribed shorthand notes of Mr. Conzelmann containing the confessions of defendants are copied in incorrect order and should be read from
 
 *329
 
 page 248 to page 255 first, and then from page 241 to page 247, in order to get the proper sequence of Mr. Conzelmann’s interview with defendants.
 

 It is a most significant fact, stated in these transcribed shorthand notes, that the defendant James admitted the correctness of his written confession, made and signed by him previously at the New Orleans police headquarters, twenty hours before, with only a minor correction made.
 

 In support of this statement, we quote the following extract from the transcription of Mr. Conzelmann’s shorthand notes, commencing on page 248 of the Transcript:
 

 “I stated to him that I came to talk with him about the case and get a statement from him which he could make if he wanted to but that under no conditions would I make him any promise and would not even promise that anything would be done for him. I was only interested in getting the truth in the case and I thought that he was ready to tell the truth.
 

 “I then stated to him that I understood that
 
 he had made a statement in connection with the killing of Vincent Bologna,
 
 and asked him if he was afraid to talk to me about the case and he said no he did not, that he knew' the jig .was up and that he would talk to me. (Italics ours.)
 

 “I then read to him the following from his statement and asked him to listen to it and if it was not correct, if there were any corrections to make, I would be glad to correct it make whatever changes he wanted to make, and here I started to read the statement as follows:
 

 “I would state that two or three days previous to the hold up and shooting of Vincent Bologna, I met Ralph Eisenhardt and he told me about two fellows who came around various stores in McDonoghville collecting money for Bologna & Company and that these men carried large sums of money, approximately two thousand dollars ($2,000.00). I asked him where can we hold them up. He told me by Frank Fradella’s. I asked him did he think they would give us the money. He said ‘If they don’t we will take it.’ We then agreed to hold those men up in front of Frank Fradella’s. We also agreed to hold them up Saturday March 30th, 1935. The above plans were made under the viaduct in Algiers.
 

 “Q. Did you make that statement? A. That’s true, I made the statement.
 

 “I then read the second paragraph to him and he said that he had made that statement and that it was true.
 

 “I then read the remaining part of the statement and when I completed the reading he said it was true and correct with one exception and asked me to' let him have the statement and a pencil and he then proceeded to strike out something on the second page and after, doing this he said the statement is now true and correct and
 
 is the way the holdup and killing took place.”
 
 (Italics ours.) T. 248, 249.
 

 In the transcribed shorthand notes, the following statement was made by James as to the second confession made in the Gretna jail and concurred in by Eisenhardt :
 

 
 *331
 
 “By James: When the man began struggling with Ralph I had the shot gun on him and he grabbed it (in) one hand and it went off. I also met Joe Pumilia the night of the killing just like Ralph just told you. I got the gun from Ralph at his house, he reached it from under the pig pen, I had the shot gun all the time from the time he gave it to me where he got it from under the pig pen until we got back to his house and put it back under the pig pen.
 

 “Q. After you got the cigarettes, you and Ralph walked over at Fradella’s until this man came out of the place? A. Yes sir. Q. You did not see Joe Pumilia any more after you left him at his daddy’s place? A. I saw him twice at his mother’s place before the man came out. Before the man came along. Q. Were you two together when the man came out? A. Both together. Q. What side of the building were you on? A. On that side (indicating). Q. When Bologna came out where did you go, what did you do? A. I just followed Ralph. Q. What side were you on? A. They both attempt to indicate how they met up with Bologna when the man came out, at this point a demonstration or enactment of the thing was made.
 

 “Judge Fleury (district attorney) was used as Bologna and Eisenhardt indicated how he acted and what he did and James indicated how he acted and what he did when they met the man after he came out of the store, placing the hand with the revolver and shot gun in it and pointed to the part of the body where they placed the weapons and how Bologna grabbed for them.
 

 “At this point of illustration they both showed how they were standing and how Bologna was standing when their weapons went off and they ran away from the scene of the holdup.
 

 "By Eisenhardt: Judge
 
 (district attorney)
 
 this is a true confession, the truest Statement ever made.”
 

 We have not quoted the full confessions of the defendants, with all the details, as their statements cover pages 241 to 256 of the Transcript. But we will state that Eisenhardt and James, during their recitation, even consulted one another as to the accuracy of the details they were relating (T. 242). The defendants corroborated in many details circumstances testified to by other witnesses in the case, as, for instance, getting a cigarette from the witness Freeman (T. 242) ; getting another cigarette from Bordeneve (T. 243) ;' borrowing a hacksaw from Gremillion’s garage to saw off the shot gun (T. 245).
 

 The slight indications of physical injuries on the persons of Eisenhardt and James, as observed when they were in the Gretna jail, do not demonstrate, in our judgment, physical cruelty at the taking of the confessions in New Orleans on Saturday afternoon, April 6, 1935. There has been no affirmative proof of any cruelty practiced on Eisenhardt, and the claim of cruelty by James was contradicted by Miller and Leinhart. The whole business was remote from the taking of the confessions actually used in evidence, and any presump
 
 *333
 
 tion of continuing physical fear was more than overcome by the intervening facts throughout Saturday night and Sunday.
 

 Dr. Henry La Rocca of the Westside Clinic m Algiers went with Mr. Conrad, one of James’ lawyers, to the Gretna jail on the morning of Monday, April 8, 1935. Here is his complete testimony on direct examination regarding his examination of James:
 

 “On examining the man in question, I found that he had an adema of the upper lip, and a slight adema of the right side of the lip, and he also showed evidence of drug addiction from the signs that were found in there above the elbows of both arms.
 

 “Q. Did you examine his nose?
 

 “A. Yes. It showed a slight swelling but no external markings.”
 

 Dr. La Rocca, on cross-examination, said he had gone over James as thoroughly as he could; had stripped him to the waist; had examined him in front and behind; that he did not find any markings whatsoever on his body anywhere except on the arms, referring to the markings indicating chronic drug addiction; that he did not find any contusion about half the size of a hen egg on his forehead, as testified to by the husband of James’ sister; that there was also a slight mark on the scalp, above the hair line and under the hair; that he examined James’ forehead closely below the hair line and did not see “any marks there whatsoever.”
 

 Dr. M. M. Odom, parish coroner, as a defense witness, testified that he saw Eisenhardt in the Jefferson parish jail about 10:30 on the morning of Sunday, April 7, 1935. He said: “The only thing I found, after making a physical examination, and an inspection, I found a little red strip four or five inches below the left scapula in the back, and one about three or four inches under the right scapula in the back.”
 

 When asked if Eisenhardt had complained to him about pain in any part of his body, he answered:
 

 “He said his elbow hurt him.
 

 “Q. Did he tell you what the cause of that hurting was?
 

 “A. He said they twisted his arm, but there was no swelling 'or nothing to indicate that there was anything wrong with his arm.”
 

 Eisenhardt did not take the witness stand and so testify. He did not even name any particular officer.
 

 Dr. Odom testified, on cross-examination by the state, that Eisenhardt did not look like a man who had been subjected to any physical torture; that as to his mental condition he seemed to be all right; that as far as behavior was concerned, or emotional strain or fear, or laboring under any fear of coercion was concerned, he seemed to be perfectly normal.
 

 As these trifling bruises might easily have been self-inflicted or mutually inflicted, and as a question of credibility is involved in the case, we unhesitatingly accept as true the testimony of the district attorney and his assistant, and that of the other officers that the confessions were free and voluntary. ■
 

 
 *335
 
 The record is very far from showing that the defendants were plied with alcohol to affect them so as to more readily induce confessions during the interview with the district attorney and' his assistant, as inferred in the brief of defendants.
 

 The facts are that during this interview the defendants themselves asked for a drink. A small drink was given each; and, after the interview, they asked if they could have what was left in the bottle, about a drink, and it was given them. See Testimony of Fleury and Conzelmann, T. 158, 161, 163.
 

 The same exaggeration as to the drinks received by defendants, at their own request, exists in this case as to the bruises on the bodies of the defendants, which are shown by the disinterested witnesses in the case to be very slight; in fact, they are so trivial that defendants never complained of them to any officer in the Gretna jail or elsewhere. To illustrate: Mr. Roy Keenan, brother-in-law of James, was placed on the witness stand, and testified, out of the presence of the jury on direct examination, on the question of the admissibility of the confessions, that James “had a
 
 swollen
 
 lip on the right side, a
 
 swollen
 
 nose, a
 
 bump
 
 on the right side of the forehead, about in this location, and I
 
 think
 
 he had a
 
 bump
 
 on the back of his head, but I can’t say as to my personal knowledge.” He ended up his testimony by stating that he judged that the
 
 bump
 
 on the forehead was “about a half as big as a
 
 hen’s egg.’’
 
 But when pressed on cross-examination by the state, this witness testified as follows:
 

 “Now, Mr. Keenan, these bruises that you saw, how pronounced were they ? Were they such that you had to look closely to find them, or could you see them readily ?
 

 “Well, it depends on the distance. I was about a little more than halfway the distance that you are from me, and I could have seen them fairly plainly.” (Witness and examiner were then between. 12 and 15 feet apart in the courtroom.)
 

 Pressed further on cross-examination about the lip, he said it was “swollen
 
 some.
 

 “Q.
 
 But very
 
 slightly?
 

 “A.
 
 Well, I guess might say that.
 

 “Q. You guess I might say that?
 

 “A. Yes.
 

 “Q. You know as a matter of fact that this contusion on his lip was
 
 very slight?
 

 “A. Yes.
 

 “Q. Don’t you know that the
 
 contusion
 
 on his nose, if one existed at all, was
 
 very slight?
 

 “A.
 
 His nose was not swollen
 
 very much.
 

 “Q.
 
 You had to look
 
 closely
 
 to see it, didn’t you ?
 

 “A. You had to look
 
 close
 
 to see it.” (Italics ours.)
 

 Dr. La Rocca, a defense witness, testified that he found no “bump” at all on the forehead of James.
 

 Joint Bills
 

 (Bill No. 4 by James, Bill No. 4 by Eisenhardt)
 

 These are parallel bills as to matters of fact, and are found in the transcript at pages 54 and 106.
 

 
 *337
 
 The foundation for the admission of the confessions of defendant made in the Gretna jail was laid by the examination of the witnesses, out of the presence of the jury, and without objection by defendants. After the confessions had been admitted as free and voluntary and had gone to the jury, the defendant James
 
 then
 
 offered Mr. Roy Keenan, Mrs. Roy Keenan, and Mrs. Bernard as witnesses for the purpose of showing the
 
 physical condition
 
 of the defendant James
 
 “at the time of the taking of the alleged confession on April 7, 1935,”
 
 at or about 5 :00 or 6 :00 p. m., when Mr. and Mrs. Keenan and Mrs. Bernard, the brother-in-law, sister, and aunt of the defendant, visited the Gretna jail, “for the purpose of the question of the
 
 materiality and effect to he given said confession.”
 
 (Italics ours.)
 

 And the defendant Eisenhardt offered Mr. Leo McCune, Dr. Odom, and Mr. Beauregard Miller for the same purpose.
 

 All of these witnesses, except Mrs. Roy Keenan and Mrs. Bernard, had already testified, without objection out of the presence of the jury, as to the
 
 physical condition
 
 of both defendants, when the preliminary issue as to the admissibility of the confessions was tried.
 

 The clear purpose of this procedure was to rehash all of this testimony as to magnified bruises before the jury, although the trial judge had heard all of it, except that of Mrs. Roy Keenan and Mrs. Bernard who, we assume, would not contradict Mr. Keenan. It was the theory of the defendants that these slight marks or bruises on the face of James were evidence of previous ill treatment elsewhere. The trial judge had already ruled that these alleged occurrences were remote, disconnected, and irrelevant, and had admitted the confessions made by defendants in the Gretna jail as freely and voluntarily made. Upon counsel for the state urging the same grounds of objection, and adding that these matters were merely resorted to as a basis for an attempt toward prejudice, the trial judge sustained this objection, and Mr. Keenan and his relatives were not allowed to tell the jury about the alleged bumps on the face of defendant James.
 

 In one of these parallel bills, No. 4, it is stated that Dr. H. R. Unsworth, a qualified alienist, was tendered to the court for the purpose of showing the
 
 mental condition
 
 of James “on the date and at the time of the taking of
 
 the alleged
 
 confession, April 7, 1935, at 5:30 or 6 :00' P. M., and that the witness was also tendered for the purpose of the materiality and the effect the jury should give said confession.” (Italics ours.)
 

 In excluding the testimony of Dr. Unsworth, the trial judge states in bill No. 4, reserved by James, “that insofar as the testimony of Dr. Unsworth is concerned my ruling in this bill is as explained in my Per Curiam to Bill of Exceptions No. 5.” T. p. 55. Bill No. 5 is a separate bill reserved by James.
 

 It will be shown later in this opinion that Dr. Unsworth never saw James until May 27th, and had written Judge Rivarde, the trial judge, on that date that he had seen him only once, and was unable from that one observation to express any opinion
 
 *339
 
 upon his condition. Furthermore, the court had appointed a lunacy commission which had held James
 
 presently
 
 sane, and no issue had been made in the case relative to his sanity at the time of the commission of the offense. The court, therefore, on the objection of the state, excluded the testimony of Dr. Unsworth.
 

 Dr. Unsworth was not allowed to tell the jury that from one observation he made on or about May 27th he thought James was feeble-minded on or about April 7th.
 

 The record as to the conversation of James with Mr. Conzelmann, assistant district attorney, at the time the confessions were taken on April 7, 1935, shows clearly that James was anything but feeble-minded on that date. T. 146-162.
 

 The rulings of the trial judge are correct, in our opinion.
 

 Joint Bills
 

 (No. 5 by Eisenhardt, No. 7 by James)
 

 These bills are found at pages 64 and 108 of the Transcript. They are reserved to the overruling of motions made by both defendants to have the state’s trial table and chair moved several feet from the jury box that it abutted. The reason assigned by Eisenhardt is that by its proximity thereto the trial jury could overhear the conversations between the state’s attorneys and their associates during the trial, and that the jurors could observe and read documents upon the trial table, all of which could have an effect upon and be good reasons and cause by which the jury, and particularly the jurors nearest the trial table, could be influenced.
 

 It is suggested in the bill by James that the jurors might receive from the state’s attorneys a
 
 "whispered suggestion or secret sign.”
 
 We fail to observe in the record any bill reserved during the trial because of the gratuitous anticipatioñs of counsel for defense.
 

 It is stated in the per curiam to this bill:
 

 “The court considered the objection to the position of the District Attorney’s desk and chair with relation to the jury box as untenable, for the reason that this court building was constructed about the year 1905, and the District Attorney’s chair and desk has practically been in the same position since the construction of the court house. It was in the same position when the court occupied that office and at no time, except on the trial of this case, has that position ever been questioned.
 

 “The recitals of this bill of exception assume to reflect upon the integrity and honesty of counsel, representing the State in the trial of the case, to the effect that they would by whispered suggestions or secret signs seek to influence the jury to the prejudice of the defendant.
 

 “Knowing the character of the gentlemen representing the State, the bill in my estimation is ridiculous.”
 

 Separate Bills by James (Nos. 5, 6, and 8)
 

 No. 5. Complaint by James of exclusion of proffered testimony of Dr. Unsworth during the trial to prove insanity
 
 at the time of the commission of the crime,
 
 and to prove feeble-mindedness at the time of the alleged confession. T. p. 56.
 

 
 *341
 
 No. 6. Refusal of a continuance of the hearing on the issue of
 
 present insanity.
 
 T. p. 61.
 

 No. 8. Refusal of continuance of the trial on the merits after the conclusion of the hearing on the issue of
 
 present insanity.
 
 T. p. 66.
 

 Bill No. 5 was reserved hy the attorney for James during the trial and during the period when James was making his defense. Counsel for James proposed to the court that he was going to place on the witness stand Dr. H. R. Unsworth, as an expert, to prove two things:
 

 1. That defendant James “was a mental defective (feeble-minded person) incapable of distinguishing between right and wrong on the night of the homicide”; in other words, to prove in this manner
 
 insanity at the time of the crime.
 

 2.
 
 That defendant James “was a memtally defective or feeble-minded person on April
 
 7,
 
 1935,” the night of the taking of the confessions at the Gretna jail by District Attorney Fleury and Assistant District Attorney Conzelmann.
 

 Counsel for the state objected to Dr. Unsworth being called to the witness stand by defendant on several grounds. In the first place, counsel for James on May 13, 1935, filed a motion for an inquiry only into
 
 the present
 
 sanity of defendant, and never filed a motion as to his sanity at the time of the commission of the crime, or at the time of the taking of the confessions in Gretna jail, April
 
 7,
 
 1935. (See Motion of Defendant’s Counsel, T. pp. 260, 261.)
 

 Immediately upon the motion for a lunacy commission to inquire into the
 
 present
 
 sanity of defendant James, made by his attorney on May 13, 1935, Judge Rivarde appointed Dr. J. A. O’Hara and Dr. Edmund Connely to conduct an inquiry only into the
 
 present
 
 mental condition of James.
 

 On Monday, May 27, 1935, the day of the trial, all parties appeared at court with their witnesses. Dr. O’Hara and Dr. Connely were present. Their written report, dated May 24, 1935, addressed to Judge Rivarde, was filed in the record.
 

 This report is as follows: “We have the honor to report that in accordance with your orders we have examined the above named man, Gladstone James, who is at present confined in the Jefferson Parish Prison at Gretna, La. It is our opinion that this man is
 
 presently
 
 sane and that he is capable of distinguishing between right and wrong and is capable of assisting in his defense.”
 

 After the filing of the report, the trial judge ordered the case to proceed, first by a hearing on the motion to test the present insanity of the defendant James, before trial on the merits began.
 

 A continuance on that hearing (bill No. 6) was then moved for by counsel for James on the ground that he desired to have Dr. H. R. Unsworth make a mental examination of defendant and testify on his behalf at the hearing upon fhat issue. This continuance was properly refused. The attorneys for James had been representing him since April 23d. They made no move for a lunacy commission until May 13th,
 
 *343
 
 when the case was first set for trial. They had had two weeks to make an examination, the same time taken by the experts appointed by the court, but waited and came in on May 27th, on the day again fixed for trial, seeking further delay for an examination.
 

 As further evidence of laches, counsel for defendant presented a letter dated May 24, 1935, addressed to Judge Rivarde by Dr. Unsworth, stating that he had been asked by James’ attorneys to examine him and to testify on his present sanity, but the time had allowed him to visit the defendant only once, and it would be impossible for him to testify on the subject at that date.
 

 After the motion for continuance had been overruled, a hearing was then had on the subject of the present insanity of James. Both of the experts appointed by the court took the witness stand, testified in substantiation of their report, and were cross-examined by James’ attorneys. After hearing this evidence, and observing the defendant James in the courtroom, the trial judge decided that the defendant was presently sane and was fully capable of standing trial and aiding his attorneys in his defense, and ordered the trial to proceed on the merits without further delay.
 

 Counsel for James then moved a second time for a continuance (bill No. 8), on the ground that the trial judge should not proceed with the case for the reason that defendant was not capable of assisting in his defense and did not understand the nature of the proceedings against him.
 

 Again, the trial judge overruled the motion for continuance. His ruling was proper, for the same reasons already assigned, and which fully justified the overruling of the first motion for continuance.
 

 In the course of the trial on the merits, counsel for James then took his bill of exception No. 5, after an attempt to prove, without previously making it an issue, insanity at the time of the commission of the crime. The trial of such an issue, under the circumstances of the case, would have been a travesty. Dr. Unsworth, the expert, offered by counsel for defendant, had observed him but once before the trial, and was not qualified to testify even as to the present insanity of the defendant. The experts appointed by the state had examined defendant only as to his present insanity, but not as to his mental condition at the date of the commission of the crime. Nor was any expert witness present qualified to testify as to the mental condition of defendant on April 7, 1935, when his confession was taken in the Gretna jail.
 

 It is elementary that, in the trial of a criminal case, the state is not called upon to meet issues not disclosed by the pleadings, and, necessarily, testimony as to such issues is irrelevant, immaterial, and inadmissible.
 

 The climax in the case was reached, however, when the defendant Jabíes, on May 29, 1935, the third day of the trial, appeared in person on the witness stand and testified before the jury in his own behalf.
 

 There is an issue in the case between the state and counsel for James as to whether Act No. 136 of 1932 requires a special written plea as to insanity at the
 
 *345
 
 date of the commission of the offense. In other words, whether a defendant must enter his special plea of insanity in advance, or otherwise be barred from raising that issue unexpectedly and without previous notice to the state on the trial.
 

 Act No. 136 of 1932, § 1, is divided into four paragraphs, each of considerable length.
 

 The first two paragraphs of section 1 of the act relate to the
 
 present mental condition
 
 of an accused and, as far as the issue here involved is concerned, the pertinent parts of paragraphs 1 and ,2 of section 1 of the act are as follows:
 

 “Art. 267. If before or during the trial
 
 the court has reasonable ground to believe
 
 that the defendant, against whom an indictment has been found or information filed, is insane, or mentally defective, to the extent that he is unable to understand the proceedings against him or to assist in his defense,
 
 the court shall immediately fix a time for a hearing
 
 to determine the defendant’s mental condition. The court may appoint two disinterested qualified experts in mental diseases to examine the defendant with regard to his
 
 present mental condition
 
 and to testify at the hearing.”
 

 “The said experts shall
 
 within thirty days make their reports in writing to the said presiding Judge.
 
 The findings of the experts shall constitute the report of the examination,
 
 and the report shall be accessible to the District Attorney
 
 and to the attorney for the accused. Other evidence regarding the defendant’s mental condition may be introduced at the hearing by either party.
 

 “If the court,
 
 after the hearing,
 
 decides that the defendant is able to understand the proceedings and to assist in his defense, it shall proceed with the trial.” (Italics ours.)
 

 It is clear from the above provisions that a defendant who desires to rely upon
 
 his present mental condition
 
 in a case cannot do so unexpectedly and without previous notice to the state. The court must have “reasonable ground to believe” that the defendant is “mentally defective, to the extent that he is unable to understand 'the proceedings against him or to assist in his defense” ; and, necessarily, a motion or plea suggesting such fact must be filed in the case. It then becomes the duty of the court to'“immediately fix a time for
 
 a hearing,”
 
 a contradictory proceeding, preceded by the report of the mental experts, which “shall be accessible to the
 
 District Attorney
 
 and to the attorney for the accused”; and “other evidence regarding the defendant’s mental condition may be introduced at the hearing by either party.” Besides, it is provided that, “The said experts shall
 
 within thirty days make their reports in writing to the said presiding Judge.”
 

 The following extracts from paragraph 3 of section 1 of the act are pertinent, if the accused relies upon insanity or mental defectiveness on his part
 
 at the time of the commission
 
 of the offense charged: “Whenever, on a prosecution by indictment or information, the existence of insanity or mental defect on the part of defendant
 
 at the time of the alleged commission
 
 of the offense charged becomes
 
 an issue
 
 in the cause, the court may appoint one or more
 
 *347
 
 •disinterested qualified experts in mental diseases, not exceeding three,
 
 to examine the defendant.”
 

 “The said experts shall
 
 within thirty days
 
 make their reports in writing to the said presiding Judge. The findings of the experts shall constitute the report of the examination
 
 and the report shall be accessible to the District Attorney
 
 and to the attorney for the accused. If the. court does so appoint such experts,
 
 the clerk shall
 
 notify the prosecuting attorney and counsel for the defendant
 
 of such appointment and shall give the names and addresses of the experts so appointed.”
 

 “The appointment of experts by the court shall not preclude
 
 the State
 
 or defendant from
 
 calling expert witnesses to testify at the trial.”
 

 “The experts appointed by the court shall be summoned to testify at the trial and shall be examined by the court,
 
 and may be examined by counsel for the State
 
 and the defendant.” (Italics ours.)
 

 The above provisions so clearly contemplate a hearing contradictorily with the state, and after notice to the prosecuting officer, that extended argument is not necessary. It is patent that “the existence of insanity or mental defect on the part of the defendant at the time of the alleged commission of the offense charged
 
 becomes an issue
 
 in the cause,” only when raised by motion or plea.
 

 The defendant James, therefore, was not entitled, under the plain provisions of Act No. 136 of 1932, to raise the issue of insanity or mental defect at the time of the commission of the offense before the jury in this case, without motion or plea, nor to raise the issue of mental defect, without such motion or plea, at the time the confession was taken.
 

 This act also clearly provides that the court, after hearing, decides the issue as to
 
 the present mental condition
 
 of the accused; but it does not provide that
 
 the court
 
 shall or may decide the issue of
 
 insanity at the time of the commission of the offense.
 
 That matter is left under the act to the jury for decision, and properly so,, as it is a fact affecting the guilt or innocence of the accused.
 

 The act does not deprive a defendant of his right to trial before a jury on the facts of the case; but it does provide, and wisely in our judgment, that defendants who plead insanity or mental defect cannot do so on the spur of the moment and by surprise to the state, but must raise the issue as directed in the act, with due notice to the state and opportunity to be heard.
 

 The act does not vest in the experts appointed by the court the right or authority to decide,
 
 definitively,
 
 the issue .of insanity at the time of the commission of the offense,, and thereby arbitrarily invade the province-of the jury, as exclusive judges of the facts of the case, affecting the guilt or innocence of the accused. On the contrary, it is specifically provided in the act thdt, “The appointment of experts by the court
 
 shall not' preclude the State or defendant from calling expert witnesses to testify at the trial.”'
 

 But the act does require, in unmistakable terms, that
 
 "disinterested qualified ex
 
 
 *349
 

 perts”
 
 shall he appointed by the court, and that
 
 "the clerk shall notify the prosecuting attorney
 
 and counsel for the defendant of such appointment
 
 and shall-give the names and addresses of the experts so appointed.”
 

 The plain purpose of the act is to avoid, as far as possible, “medical quacks” and fabricated pleas of insanity but, at the same time, preserve the constitutional rights of a defendant to trial by jury on the facts of the case. For these reasons, our conclusion is that Act No. 136 of 1932 is a legitimate exertion of the police power of the state and is, therefore, constitutional.
 

 It is apparent that a plea of present insanity under the act must be disposed of on the day fixed for trial, but in advance of the merits, as such plea affects the mental capacity of a defendant to understand the proceedings against him or to assist in his defense.
 

 But as the plea of insanity at the time of the commission of the crime involves a fact affecting the guilt or innocence of the defendant, necessarily it must be tried on the merits on the day fixed for trial.
 

 As the insanity of a defendant at the time of the commission of the crime is a past fact, relating to his mental condition in a criminal transaction already executed, it is evident that this kind of insanity could not arise during the trial. But
 
 present
 
 insanity may exist, after the commission of the crime, both “before and during the trial,” and, in either event, Act No. 136 of 1932, being constitutional, must be complied with.
 

 As a court is without jurisdiction to try a person presently insane, no jeopardy attaches, and the court, on sustaining a plea of present insanity during the trial, may therefore discharge the jury and take proper steps to have defendant committed to the proper institution, as provided in the act. If, thereafter, the defendant regains his sanity, he may be tried, when that fact is determined after proper hearing. See second paragraph, § 1, Act No. 136 of 1932.
 

 Separate Bills by Eisenhardt
 

 (Bills Nos. 6 and 7)
 

 No. 6. Attacking the short form of murder indictment.
 

 No. 7. To the overruling of a motion for a new trial.
 

 Bill No. 6 is found at page 110 of the Transcript, and Bill No. 7 is found at page 138 of the Transcript.
 

 The body of the indictment reads as follows: “The Grand Jurors of the State of Louisiana, duly empaneled and sworn, in and for the body of the Parish of Jefferson, in the name and by the authority of the said State, upon their oath present:
 
 That one Ralph Eisenhardt, one Gladstone James and one Joseph Pumilia,
 
 late of the Parish of Jefferson, on or about the thirtieth (30th) day of March, in the year of our Lord, one thousand nine hundred and thirty-five (1935) with force and arms, in the parish of Jefferson aforesaid, and within the jurisdiction of the Twenty-fourth Judicial District Court of Louisiana, in and for the Parish of Jefferson aforesaid, then and there being,
 
 murdered Vincent Bologna,
 
 
 *351
 
 contrary to the form of the Statute of the State of Louisiana, in such case made and provided, and against the peace and dignity of the State.” (Italics ours.)
 

 Article 235 of the Code of Criminal Procedure provides specifically for this form of indictment, as follows:
 

 “The following forms of indictments may be used in the cases in which they are applicable, but any other forms authorized by this or any other law of this State may also be used: * * *
 

 “Murder' — A. B. murdered C. D.”
 

 In the recent case of State v. Capaci, 179 La. 462, 473, 154 So. 419, 423, we disposed of the identical point here raised in the following language: “Since the word ‘murdered’ used in the indictment in this case is ‘sufficient to include in its legal significance the unlawful killing of a human being with malice aforethought,’ as held in the White Case [State v. White, 172 La. 1045, 136 So. 47], the addition of the words ‘wilfully and feloniously’ is an unnecessary allegation, and must be rejected as surplus-age, under article 240 of the Code of Criminal Procedure. See, also, State v. Leonard, 162 La. [357] 362, 110 So. 557.”
 

 There is no merit in this bill reserved by the defendant Eisenhardt.
 

 Bill No. 7, reserved by the defendant Eisenhardt to the overruling of a motion for a new trial, merely restates the points already raised by this defendant in his previous six bills, and raises no new question. See motion for new trial filed by Eisenhardt, T. pp. 125-137.
 

 As those six bills have already been fully discussed in this opinion, we need not repeat here the arguments on those points.
 

 It is therefore ordered that the conviction and sentence of each defendant, herein appealed from, be and are hereby affirmed.
 

 O’NIELL, C. J., absent.