47 So.2d 496 (1950)
217 La. 773
STATE
v.
DOWDY et al.
No. 39788.
Supreme Court of Louisiana.
May 29, 1950.
Rehearing Denied June 30, 1950.
Writ of Certiorari Denied October 16, 1950.
*500 Alwine L. Mulhearn, Rufus T. Yerger, Edgar H. Lancaster, Jr., Jack H. Folk, all of Tallulah, for appellant.
Bolivar E. Kemp, Jr., Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Thompson L. Clarke, Dist. Atty., St. Joseph, Cliff C. Adams, Asst. Dist. Atty., Tallulah, for appellee.
Writ of Certiorari Denied October 16, 1950. See 71 S.Ct. 75.
LE BLANC, Justice.
George R. Dowdy and J. D. Dowdy, father and son, were jointly indicted by a Grand Jury of the Parish of Madison for the murder of one Walter N. Dorman, formerly a resident of that parish. After a trial in the district court which lasted eleven days, they both were convicted by a jury, the verdict against J. D. Dowdy being "guilty" and that against George R. Dowdy, "guilty without capital punishment". Motions for a new trial were overruled and after being sentenced they took this appeal.
Walter N. Dorman lost his life at approximately 11:30 o'clock on the night of October 22, 1948. Remnants of his remains were found, after a cabin situated on a plantation some eight miles north of the town of Tallulah in Madison Parish, had been entirely demolished by an explosion from a charge of dynamite. The case was one of purely circumstantial evidence which required the taking of considerable testimony in order to link all of the circumstances and that, no doubt, necessarily prolonged the trial.
The accused were at first represented by counsel employed by themselves and who retired from the case before the actual trial took place, whereupon the Court appointed as counsel to represent them, Mrs. Alwine L. Mulhearn, Rufus T. Yerger, Edgar H. Lancaster, Jr., and Jack Folk. Of these it appears that Mrs. Mulhearn was the only one having had five years experience as a practicing attorney.
Upon conviction the defendants took this appeal and through their counsel are presenting for the Court's consideration fifty-one Bills of Exception, only two of which appear to have been specifically abandoned. Some of the others are cumulated in different groups as they all more or less relate to the same matters and these will be considered and disposed of together.
Before taking up any of these bills of exception it becomes necessary for the court to pass on another matter which is of importance on this appeal. That matter has reference to the per curiams by the district judge, all of which were filed after the appeal had been taken. Under such circumstances the rule of law is that the per curiams cannot be considered. Article 545 of the Code of Criminal Law and Procedure prescribes that "after an appeal has been granted no further action in the case can be taken by the trial judge; provided, that as to matters of ministerial or not in controversy on appeal, the trial court may render interlocutory orders and definitive judgments." In State v. Brown, 214 La. 18, 36 So.2d 624, the Court held that a per curiam is neither an interlocutory order nor a definitive judgment and therefore in passing on bills of exception the per curiams filed by the trial judge after the appeal has been taken, will not be considered. That decision is controlling in the present case and therefore we are limited in our examination to a consideration of the bills of exception on the objection as made to each and the ruling of the court thereon.
Bill of Exception No. 1 was reserved to the ruling of the trial judge in overruling defendants counsel's motion for subpoena for their inspection of the fuse, dynamite-caps and clothing belonging to the deceased, Walter Dorman.
The rule with regard to pre-trial inspection was the subject of thorough discussion in State v. Dorsey, 207 La. 928, 22 So.2d 273, 285, where the court had under consideration a rule for inspection of a written confession made by the accused himself, and, as to such confession, it was held that the State must produce it. However, it is to be noted that in that case the Court stated: "It is not our intention to overrule the prior jurisprudence of this State, and particularly the various cases cited by counsel for the State, in each of which defendant was denied pre-trial inspection *501 of written confessions of co-defendants, written statements of witnesses, or police reports in the hands of a sheriff, police department, or district attorney, and we do not overrule these cases." Subsequently, in State v. Mattio, 212 La. 284, 31 So.2d 801, it was held that the rule of inspection as stated in the Dorsey case did not apply to police reports and written statements of witnesses in possession of the State, but was limited to written confessions by the accused himself. The last case in which the question was considered is State v. Simpson, 216 La. 212, 43 So.2d 585, in which the distinction between the ruling made in the Dorsey case and the Mattio case is again made and in which it was held that all that the defendant was entitled to receive in response to the prayer for over was his own written confession. The articles which are demanded for inspection in the motion in this case are not statements or confessions of either the accused themselves or anyone else and there fore they do not come under the rule of the Dorsey case. The accused were not entitled to their inspection as a matter of right and their application therefore was a matter which addressed itself to the discretion of the trial judge, "whose ruling will be set aside only upon a showing of gross abuse of discretion." See 23 C.J.S., Criminal Law, § 955, page 262. No such abuse was shown, as far as the record reveals, in this case and therefore we hold the ruling was correct.
Bills of Exception Nos. 2, 3, 5, 6, 9, 10, 11, 12, and 13 are all identical in nature and were all reserved by the defendants to the action of the Court in instructing the tales jurors who had been summoned, to leave the courtroom but to remain in the court house until they were called on their voir dire. We find no merit in these bills as the action taken by the trial judge was one in which he was vested with wide discretion and we find no harm resulted from the manner in which he exercised it.
We know of no provision of the Code of Criminal Law and Procedure, nor of any statute, and defense cites none, which requires tales jurors to remain in the court room at all times until they are actually called for examination upon their voir dire, provided they are within ready access to the court when so called. If, on the other hand, for some reason which the trial judge deems appropriate, they should be excluded from actual presence in the court room but remain under his orders in the court house, that is a matter that is left to his discretion and, unless some fraud has been practiced or some great wrong results, it will not be deemed sufficient to reverse a verdict.
Bills of Exception Nos. 4, 7, and 14 relate to the manner in which the tales jurymen were drawn in order to appear for service. The complaint here is that the names of the tales jurors were first drawn from the tales jury box and were then placed in the jury box from which they were drawn by the sheriff, and the jurors were then summoned to report in the order drawn; that they were not summoned to report in the order drawn by the clerk, immediately, as required by Article 186 of the Code of Criminal Procedure but were instructed to report at 9 o'clock on the day following the drawing. We are of the opinion that there was a substantial compliance with provisions of Article 186 of the Code of Criminal Procedure and hold further, that that also is a matter in which the trial judge is vested with a large amount of discretion for, as pointed out in State v. Smothers, 168 La. 1099, 123 So. 781, 783, if he is held to a strict compliance with the provisions of the article relating to the drawing of tales jurors, there might appear circumstances under which, of necessity, the court would cease to function. As was stated in that case, "where the accused is not injured thereby, the trial judge may, in the reasonable exercise of judicial discretion, transpose the order in which both regular and tales jurors may be called for examination upon their voir dire."
With regard to the instructions given by the Court, that the tales jurors were to report at 9 o'clock on the morning of the day following their drawing, we have no hesitancy in stating that that also was *502 a matter in which the trial judge had to use his judgment, as he had to determine whether there would be time to continue with the trial of the case whilst the tales jurors were being summoned, or whether it would be necessary to continue the trial until the day following, when the tales jurors would have to report. He has entire charge of the conduct of the trial and has to use and exercise his judgment as to the best manner in which it may be dispatched. In using the word "immediately" in prescribing the time when the tales jurors are to report, it is contemplated by Article 186 that they shall report at such a time as is reasonable and practicable for them to do so. Necessarily, if the sheriff has to summon thirty tales jurors, all thirty of them cannot be summoned to report right at the moment, but a reasonable time must be allowed for that purpose, and if the court, in its discretion, finds, that as the trial progresses, a reasonable time for them to report would be the day following the one on which they are drawn, his action in so ordering will not be disturbed unless some prejudice is shown, and none appears in this case.
Bill of Exception No. 8 was reserved in connection with the separation of jurors who had been accepted up to a certain time during the selection of the entire jury. Counsel for the accused contend that the action of the trial judge in permitting such separation was in violation of Article 394 of the Code of Criminal Law and Procedure which provides that: "From the moment of the acceptance of any juror until the rendition of verdict or the entry of a mistrial, as the case may be, the jurors shall be kept together under the charge of an officer in such a way as to be secluded from all outside communication; * * *."
It appears from the record that the selection of the jury was prolonged to such an extent that the trial judge, in the interest, and for the convenience and comfort, of those jurors who had been selected, deemed it advisable that they should not be made to sit in the jury box for an indefinite time while awaiting the selection of the other jurors, and he therefore suggested that those who had been selected be taken to an adjoining room in the court house, where they were to remain under the surveillance and custody of the sheriff until the others had been accepted. As we understand, from the transcript, counsel representing the accused agreed to this procedure, and we are somewhat at a loss to understand how they are now urging this point, unless it be their contention that under the agreement, as the new jurors were selected, they should have been ordered to repair immediately to this adjoining room, and that with respect to one of those so selected, he was not ordered to go to that room, but remained in the jury box a period of one hour; and with respect to another, he was permitted to remain one hour and twenty-five minutes. Clearly, in our opinion, that was not such a separation of the jurors as would contravene the provisions of article 394 of the Criminal Code and this bill of exception strikes us as being somewhat frivolous. The very essence of the provisions under which the jury shall be kept together is that they be thus secluded from all outside communications. Under the facts and circumstances as they appear to us in this case, the selected jurors, who were in custody of a sheriff at all times, and those who remained for a short period in the jury box separated from them, were all secluded from outside contacts and communications. Moreover, counsel have not pointed out in what manner the accused were prejudiced by this humane action on the part of the trial judge.
Bill of Exception 15 relates to the refusal of the trial judge to grant the defendants a separate trial on the plea of insanity at the time of the commission of the crime, filed by the defendant, J. D. Dowdy. The ruling of the trial judge was entirely proper for a plea of insanity at the time of the commission of the crime involves a fact affecting the guilt or the innocence of the accused and necessarily it must be tried on the merits and submitted to the jury the same as all other facts presented during the trial of the *503 case. See State v. Eisenhardt, 185 La. 308, 345, 349, 169 So. 417; State v. Sample, 203 La. 841, 845, 14 So.2d 678.
Bill of Exception 16 was reserved to the action of the court in overruling an objection by counsel for defense to certain remarks that were made by the district attorney in his opening statement to the jury, in which he referred to prior statements made by J. D. Dowdy regarding insurance companies.
The basis of the objection was that these statements might have some bearing on certain testimony which the State would probably offer during the trial of the case and which would be inadmissible for the reason that it might relate to a crime other than the one with which these defendants were charged, that is, a crime to defraud an insurance company whereas they were charged with the crime of murder.
In outlining the steps of a trial in a criminal case after the jury shall have been impaneled and the indictment read, Article 333 of the Code of Criminal Law and Procedure prescribes the following order: "The reading of the plea to the jury; the opening statement of the district attorney explaining the nature of the charge and the evidence by which he expects to establish the same; * * *." In this case as we have previously stated the State had to rely entirely on circumstantial proof and in its effort to substantiate that proof and ascertain the motive for the crime, it appeared from investigations made that these accused had taken out life and other insurance policies with the object of faking the death of J. D. Dowdy and ultimately collecting from the insurance companies. The statement by the district attorney relating to these matters was one in which he told the jury what he intended to prove as one of the links in the chain of circumstantial evidence by which he expected to establish the charge of murder against them.
In State v. Goldstein, 187 La. 353, 174 So. 873, 874, in passing on a bill of exception of the same nature as the one presently under consideration this Court held that the statement of the district attorney which is made "to serve as a predicate for the introduction by the State of testimony showing certain acts or conduct on the part of the defendant as would tend to establish his guilty knowledge, the essential element in the offense with which he was charged," was clearly admissible, citing Code of Criminal Procedure, Article 446; and State v. Colombo, 171 La. 475, 131 So. 464. The Court further stated that "It was within the province of the district attorney to state the facts he expected to prove on the trial of the case." As also pointed out in that case, such testimony as the statement of the district attorney may be predicated on, must necessarily be material to the issues of the case and if it is not, it can be so ruled upon when offered and properly objected to. We conclude, therefore, that the ruling of the trial court in this case was correct.
Bill of Exception No. 17 relates to the testimony of the sheriff regarding his whereabouts on the night the explosion took place. The sheriff's testimony is to the effect that he did not report to the scene immediately as he was engaged in investigating another crime which had been reported that same evening. We can see no merit whatsoever in this bill and note that it is not argued in brief of counsel for the accused. We will assume, therefore, that it has been abandoned.
Bill of Exception 18 has specifically been abandoned as we note in brief of counsel for defendants.
Bill of Exception 19 was taken to the attempt by the State to have the sheriff describe certain insurance policies and other documents which he had taken from the suitcase of George R. Dowdy. The objection to that testimony was based on the ground that the policies themselves would be the best evidence. As they were later offered and introduced in evidence, that would seem to have taken care of the objection made. We find no merit whatever in this bill.
Bill of Exception No. 20 has reference to the admission of certain testimony regarding what is said to be a confession made by J. D. Dowdy while he was being transported from Shreveport to Tallulah, after having been apprehended in the State of *504 Texas. We deem it necessary in considering this bill to relate what took place on that trip and how Dowdy came to make a statement regarding what occurred on the night of the dynamiting of the house.
The Sheriff of Madison Parish, accompanied by one of his deputies and a Pinkerton detective who had been employed by an insurance company, went to Shreveport to get J. D. Dowdy and transport him to the parish jail of Madison Parish. The trip was made by automobile; a four or five passenger Ford Sedan. They left Shreveport shortly after noon with the prisoner and at that time the detective was driving the car and the sheriff occupied the seat next to him. The deputy sheriff sat in the rear of the car with Dowdy who occupied the seat immediately behind the driver. They remained seated in this manner until they reached Monroe sometime between five and six o'clock when the sheriff himself took over the driving and the detective sat on the back seat with the prisoner.
During the trip the prisoner was questioned and in substance, he stated that he and Walter Dorman had gone to his home that night, having been driven there by a Negro taxi driver; that when they got to the cabin they were preparing to go fishing; that they took dynamite and tied it together making three bundles and then laid them on a cot. They then decided that they wanted to eat and as he had some pork chops in the house they started cooking them; that Dorman said he was a good cook and as he prepared to fry the chops he (Dowdy) felt a desire to relieve himself. He went outside some fifteen yards from the cabin and while he was in a squatting position the house blew up; that had the effect of stunning him and he laid on the ground for thirty minutes then got up and left. The testimony is all to the effect that there was no force or duress used, no threats, promises or undue influence of any kind and that the statement made was purely voluntary. It was brought out on cross-examination, while the proper foundation was being laid for the introduction of this testimony, that the prisoner was handcuffed but in such a manner, as described by the sheriff, as to make him as comfortable as possible and that otherwise the sheriff and his deputy were armed, carrying their revolvers in their respective holsters, as is customary for such officers to do.
Upon that foundation having been laid the Court ruled that the statement was admissible in evidence. In fact the Court held that such statement did not amount to a confession but was more in the nature of an admission. Regardless of its nature we thoroughly agree with the trial judge that the statement was admissible and that there were absolutely no such conditions presented as are necessary under Article 451 of the Code of Criminal Procedure to prevent its introduction as evidence in the case.
In State v. White, 156 La. 770, 101 So. 136, 143, there was a situation somewhat similar to the one that existed in this case. The prisoner was being transported by the officers in an automobile from Minden to Coushatta, Louisiana. Before leaving Minden he was shackled and both deputies were armed. In ruling on a bill of exception similar to the one here under consideration the court stated: "The fact that the deputy, to whom defendant made the statement, was armed at the time it was made, as was also the deputy who was driving the automobile, does not render it inadmissible, in view of the affirmative proof adduced that no threats were made against defendant, and that the officers in charge of him did not intimidate him in any manner." The court did not refer to the fact that the prisoner was shackled and probably that point was not urged as it is urged by counsel in this case who seem to stress the fact that the prisoner was handcuffed. It occurs to us that the shackling or handcuffing of a prisoner who is to be charged with the serious crime of murder is an ordinary and customary procedure and counsel have not referred us to any decision by any court in which such an act would be considered as the use of force, threat, or intimidation which would invalidate an incriminatory statement made by a prisoner.
It is further shown in this bill that there was an argument between the prisoner and the Pinkerton detective in which heated *505 words were used but that was after the prisoner had given his statement and we, therefore, cannot consider any remarks made between them as constituting duress or threats in extracting a confession from the accused.
For these reasons, we find that this bill is also without merit.
Bills of Exception Nos. 21, 28, and 29 all refer to the introduction in evidence of human teeth, and a photograph of a dismembered foot of a human being on the ground that these were gruesome objects and that their production would have the effect of prejudicing the minds of the jury.
It was shown that these teeth and human limbs were found at the scene of the demolished cabin. The teeth were preserved and taped to a cardboard. The remnants of a human corpse were later buried. However, before the burial had taken place a photograph of one of the feet was taken. The purpose of the State in offering these objects was to identify the victim of the crime and were no doubt properly admitted for that purpose. The objection made that they were gruesome and would have the effect of prejudicing the minds of the jury has no merit for the reason, in the first place, that their offer for identification purposes was purely legitimate and secondly, our observation of them, as they were produced with the record in this case, clearly refutes any idea of gruesomeness.
In support of this bill of exception, counsel apparently rely on the case of State v. Morgan, 211 La. 572, 30 So.2d 434, 436, in which this court held that the introduction of a gruesome photograph of the body of the homicide was improper on the ground that its introduction, in that case, was not at all necessary or relevant to any fact at issue at the time it was offered in evidence. The Court stated that under such circumstances a gruesome photograph must be excluded "if it may have a tendency to cause an undue influence upon the jury." The question as to the admissibility, vel non, of gruesome objects in a criminal prosecution is a debatable one. In State v. Johnson, 198 La. 195, 3 So.2d 556, 559, the Court had stated what seemed to have been a general rule on the subject. It was there held that, "The principle of admitting this kind of evidence (photographs) is but a corollary to that permitting the introduction of the physical object itself. Stated as a general rule, the proposition is that photographs are admissible in evidence when they are shown to have been accurately taken, to be a correct representation of the subject in controversy, and where they tend to illustrate any material fact in the case, or to shed light upon the transaction before the court." As authority, Wharton's Criminal Evidence, 11th Ed., Vol. 2, sec. 773, p. 1317, is cited. The same authority is cited in support of this further statement: "Where they are otherwise properly admitted, it is not a valid objection to the admissibility of photographs that they tend to prejudice the jury. Competent and material evidence should not be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible." State v. Morgan does not refute that principle but only holds that its converse has to be adopted in the event that a gruesome photograph is not at all necessary or material evidence in a criminal prosecution and should, therefore, be excluded if it may have a tendency to cause an undue influence upon the jury. In the present case the photograph was material evidence as it developed to be a very important, if not the most important, object by which the identity of the victim was proven and in that respect, the case does not come within any exception that may have been intended by the decision in the case of State v. Morgan.
Bill of Exception 22 was taken to the ruling of the trial judge permitting the sheriff to testify regarding a diagram which he had drawn of the house which had been destroyed by the explosion and introducing the diagram in evidence. The objection was to the effect that the house was almost completely demolished and that the sheriff was incompetent to testify as to the size of the rooms since he had stated that he had not been in the house for some two or three years prior to the explosion and that he did not at the time measure the house. Evidently this exception has also been abandoned *506 as it is not presented in brief of counsel for the accused. However the objection was one that went more to the weight than to the admissibility of the testimony sought to be adduced and we believe that the objection was properly overruled.
Bill of Exception 23 has reference to the qualification of a witness for the State as an expert, competent to express an opinion as to the cause of the burns found on the remnants of the leg that had been found at the site of the explosion. This witness was James E. Young, the mortician who had buried those remains. As the competency of a person to testify as an expert is a question of fact, and such competency must be established to the satisfaction of the court, we will not disturb the ruling of the trial judge who found this witness to be competent and permitted his testimony to be introduced before the jury. See State v. Dreher, 166 La. 924, 118 So. 85, Code of Criminal Procedure, Article 466.
Bills of Exception 24, 27, 32, 33, and 36 have to do with the admission of testimony regarding certain statements made by one or the other of the accused out of the presence of the other. Article 455 of the Criminal Code is the pertinent law on the subject of statements made by one co-conspirator out of the presence of the other and it reads as follows: "Each co-conspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise, and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby, or whether the conspirator doing such act or making such declaration be or be not on trial with his co-defendant. But to have this effect a prima facie case of conspiracy must have been established."
This case is one essentially of a joint enterprise between a father and son to commit the crime of murder in order to derive some personal benefit from their act and therefore they may be said to have been co-conspirators. As we have said more than once before, the case depended entirely on circumstantial evidence and therefore every circumstance which bore on the proof to be established regarding every phase of the case had to be looked into and produced before the jury if admissible. State v. Jackson, 153 La. 517, 519, 96 So. 53. The foundation to be laid for the introduction of the statements sought to be introduced was one which had to satisfy the court that a prima facie case of conspiracy had been made out. We must assume in this case the judge was so satisfied and that being so, his ruling in admitting the testimony was proper. In the final analysis the question presented under these bills resolves itself into one of fact which has to be, and as we understand, was properly submitted by the trial judge to the jury for their consideration. The ruling was correct.
Bill of Exception 25 was reserved to the admission of testimony by the funeral undertaker, who had charge of the remains of the deceased, concerning certain visits made to the funeral home by George R. Dowdy following the explosion and before the burial of those remains. That exception is not discussed in brief of counsel of the accused, and like others, which also were not discussed, we assume has been abandoned. We might mention however that, in our opinion, that again was a link in the chain of circumstantial evidence by which the State was seeking to establish the guilt of these accused and the evidence was properly admitted.
Bill of Exception No. 26 relates to the ruling of the court on certain testimony concerning the statement made to the undertaker by George R. Dowdy to the effect that the legs he had at his funeral home were to be buried without a minister.
The contention is that such a statement would tend to expose this defendant as a man devoid of any religious belief and also one who is lacking in grief, all of which would create prejudice in the mind of the jury against him. It is urged that that would be testimony tending to show bad character, which would be inadmissible for the reason that the defendant's good character had not been put at issue.
We cannot agree with counsel that the offer of such testimony would have that *507 effect. We cannot see in what manner it would reflect on the character of this defendant, nor do we think that that was its object. Rather we believe the testimony was offered for the same purpose as was that which formed the basis of the previous bill of exception, that is that it formed a part of the circumstantial proof in the case and for that reason it also was properly admitted.
Bill of Exception 30 seems to be aimed at the failure of the court reporter to have transcribed the testimony of the witness, R. R. Holt, which counsel for the accused desired to have in order to properly make certain objections and reserve their bills. What the nature of the objections and the bills of exception were is not made clear and at any rate the testimony was later transcribed and we note from brief of counsel for the State that after it had been filed with the clerk by the court reporter it was agreed by the defense that this bill was of no moment. Apparently the filing of the testimony had the effect of curing any matter counsel for the accused may have had to complain about by reason of it not having been transcribed before.
Bills of Exception 31 and 49 were reserved to the introduction of a belt in evidence. This belt was found on the person of J. D. Dowdy when he was apprehended and it was properly identified by witnesses as having been the belt that belonged to the murdered man, Walter Dorman. The purpose of its offer in evidence was again to connect the links in the chain of circumstances which placed the accused, J. D. Dowdy, at the scene of the commission of the crime and therefore it was competent circumstantial evidence to be used in the case. In State v. Richey, 198 La. 88, 3 So.2d 285, 287, the Court cited with approval the following rule in Wharton's Criminal Evidence, Vol. 11, Sec. 752, p. 1278: "* * * As an instance, the clothing of the victim of a homicide, if properly identified may be exhibited, on the principle that it is a part of the res gestae, to illustrate the nature of the wounds, to show the manner and means of death, or to throw light upon any material matter at issue which is controverted or in doubt. In like manner, this type of evidence generally i. e., real and demonstrative evidence, has been held admissible for the following probative purposes: To corroborate the testimony of a witness; to show the commission of the crime charged; to connect the accused with the commission of the crime; * * *. Evidence of this nature is also admissible to contradict the defendant's theory concerning the commission of the crime charged. * * *" From defendant J. D. Dowdy's testimony it might be inferred that Dorman's death was accidental but the proof produced by this belt and the circumstances under which it was found certainly tends to contradict any such theory. We are of the opinion that it was properly admitted in evidence. (Italics ours.)
Bills of Exception 34, 38, 39, 40 and 41 all relate to the testimony of several witnesses in regard to certain schemes proposed to them by J. D. Dowdy to defraud insurance companies and collect illegal settlements. One of the schemes testified about had no reference to insurance policies but proposed a feigned railroad accident for the purpose of collecting damages from a railroad company.
This line of testimony was objected to for two reasons: (1) that it tended to impeach the character of the accused before he had made his good character an issue in the case and (2) because such testimony related to crimes other than the one of which he stood accused.
Article 446 of the Criminal Code prescribes that: "When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent and where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged."
The word "system" used in that article has the same significance as the word "scheme" and the intention is to permit the introduction of evidence tending to prove by such systems or schemes the motive *508 which was in the mind of the accused and the means by which he ultimately was going to profit from the crime he actually committed. The schemes testified to, with one exception, all tended to simulate the death of one of the accused so that illegal collections on insurance policies could be made and it was competent, therefore, especially in a case where the State had to rely on circumstantial proof, to expose before the jury those schemes which the witnesses testified to and which would bring about the result sought to be accomplished. That was the purpose of this testimony as we view it and it was not meant to impeach the character of the accused.
In 20 American Jurisprudence, page 316, section 340, the rule of law is laid down as follows: "In criminal prosecutions, whenever the motive or intent of the accused is important and material, a somewhat wider range of evidence is permitted in showing such motive or intent than is allowed in support of other issues, otherwise, there would often be no means to reach and disclose the secret design or purpose of the act charged, in which the very gist of the offense may consist. Such intent or motive may be proved by either direct or circumstantial evidence. All evidentiary circumstances which are relative to, or tend to shed light on, the motive or intent of the defendant or which tend fairly to explain his actions are admissible in evidence against him, although they may have occurred previous to the commission of the offense."
Article 445 of our Criminal Code embodies practically the same rule, for it provides that, "In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction." Whilst it is true that these accused are charged with the crime of murder, when we look for the motive which prompted them in committing such crime, we find that it was for the purpose of collecting money in some fraudulent manner through certain schemes or systems they had in mind and the articles of the Criminal Code are board enough, we find, to permit evidence of all such schemes regardless of their nature.
Bill of Exception 35 was reserved to defendant's counsel's objection to testimony of one of the witnesses for the State who was formerly married to the sister of one of the accused and who had been separated from her. We infer from the nature of the objection that it presented the question of the hostility of the witness involved, but inasmuch as the bill is not argued or discussed in brief of counsel for defendant we will assume that it has been abandoned. At any rate we do not see what possible merit there could be in it under the testimony as it appears in the record and which is attached to the bill.
Bill of Exception 37 was taken to the testimony of the witness, S. M. Sylvester, who stated details of where he went after he left J. D. Dowdy somewhere in the State of Texas, where that accused had gone after the crime had been committed. Counsel properly concede in their brief that there was not sufficient prejudice caused by the admission of this testimony to justify the granting of a new trial in the case.
Bill of Exception 42 was taken to a question addressed by the district attorney to the witness Albert Trecost, the Pinkerton detective previously referred to, in the course of which he stated that in his opinion, "the deceased was properly referred to as the `victim'." We note the ruling of the trial judge on the objection to the effect that he instructed the jury to ignore any such statement and for them to take no cognizance whatever of it in reaching their conclusion. Had there been any prejudice arising out of the remark it was cured by the action of the trial judge in his instruction. We observe that this bill also is not stressed in brief of counsel. They evidently realized that it had no merit.
Bill of Exception No. 43 has reference also to the testimony of the witness, Trecost, regarding a statement made to him by the accused, J. D. Dowdy. We understand from some of the testimony, not particularly the testimony attached to this bill, but all of the testimony of the witness, Trecost, *509 that he endeavored to obtain a written statement from the accused, J. D. Dowdy, after the latter had been lodged in the parish jail at Tallulah. Apparently this written statement was objected to because of the circumstances under which counsel for defense claimed Trecost was attempting to obtain it. However the State withdrew the offer and the statement itself was never introduced. Trecost then testified that what was in the written statement was his recollection of the statement J. D. Dowdy had made to him and the others who were with him in the automobile on the day he was transported to Tallulah. The circumstances under which that statement was made have been referred to previously in considering bill No. 20 and we find no necessity for reiterating what was said in passing upon the merits of that exception. There is equally no merit in the present bill.
Bill of Exception 44: In this bill it is shown that the district attorney in making his closing argument before the jury stated that J. D. Dowdy had admitted that Walter Dorman, the deceased, was in the house at the time it blew up. Counsel for the defense objected to that statement on the ground that such an admission was not a part of the record and there was no evidence to support the statement. The objection having been overruled, this bill was reserved.
In view of J. D. Dowdy's own statement to the deputy sheriff and the Pinkerton agent which was properly ruled admissible in evidence, to the effect that on the night of the explosion he and Dorman had gone to the cabin and that Dorman was in the cabin cooking pork chops while he was outside to relieve himself at the moment of the explosion, it is difficult to understand why such a statement was not entirely proper and correct as it was a part of the evidence in the case. We note from counsel's brief that they do not refer to this bill and we assume that it also has been abandoned.
Bill of Exception No. 45, likewise, was taken to a remark of the district attorney in argument before the jury to the effect that there was some evidence tending to show that J. D. Dowdy had attempted to commit suicide during the time he was incarcerated in the parish jail in Shreveport. The bill of exception, itself, stipulates that the court instructed the jury to disregard the statement of the district attorney but counsel nevertheless contend that it was of so high a prejudicial nature that the instruction by the court would not cure the effect it had created.
It is true that by the terms of Article 381 of the Criminal Code, counsel must restrict himself in argument before the jury to matters as to which evidence has been received. In this case, we note from the testimony of Sheriff Hester, or rather that part of it which is part of the transcript, that he made no reference whatsoever in his examination in chief to any attempted suicide by J. D. Dowdy when he was confined in the parish jail of Caddo Parish. We note further, however, that on cross-examination of this witness by counsel for defense, when being questioned about statements that had been made to the sheriff of Caddo Parish, he was asked whether those statements were made "before or after what they called attempted suicide?" We gather from the record that the only reference which had been made to any attempted suicide was in connection with the testimony of the jailer of the Caddo Parish jail, which testimony had been excluded on objection made by counsel for defendants. If there is anything at all in the evidence with regard to any attempted suicide in the parish jail of Caddo parish, as far as the record shows, it was suggested by counsel's questions on cross-examination and it would seem, therefore, that they brought the matter out themselves.
Be that as it may, we are of the opinion that in this case the instruction of the court had the effect of erasing from the minds of the jury any prejudice that may have been produced by the district attorney's remark. The general rule is that instructions of the court at the proper time nullifies the prejudicial effect of an improper statement made by a prosecuting officer during the course of the trial. See State v. Brown, 166 La. 43, 116 So. 588. It is only in extreme cases, we believe, that the prejudice cannot be so removed and we do *510 not consider that the remarks objected to in this case were of such an extreme nature that the court's instructions did not have the proper effect. Especially is this so when we consider that the only suggestion of attempted suicide, as shown, was one prompted by counsel for defendants themselves in cross-examining a witness for the State.
Bill of Exception 46 has reference to the testimony of Sheriff Hester in connection with some measurements of the house which had been demolished by the explosion; also with regard to the partitions in that house.
In his closing argument to the jury, the district attorney referred to that testimony, and the statement was objected to on the ground that that evidence had been ruled out. It appears from the record, that the district attorney himself asked that the court instruct him to withdraw the statement, which the court did. Clearly no prejudice can arise out of that incident and we note once again that the bill is not pressed by counsel for defendants in their brief.
Bill of Exception No. 47 was taken to the refusal of the court to give a particular instruction to the jury as requested by counsel for defendants. The special charge requested was to instruct the jury that it could render a verdict of negligent homicide. Counsel apparently now realize that the court was controlled in its instructions to the jury by the provisions of Article 386 of the Criminal Code as amended by Act 161 of 1948. In view of the recent decision of this court in State v. Williams, 216 La. 419, 43 So.2d 780, counsel for the accused have now abandoned this bill.
Bill of Exception No. 48 was apparently taken to the court having granted the district attorney permission to show certain documents to the jury during the taking of the testimony of Deputy Sheriff R. R. Holt, at which time, senior counsel for the defendants, Alwine L. Mulhearn, was absent. The record is not clear as to what actually took place and the bill is not argued. However it would seem to have reference to a similar point which is raised under an unnumbered bill of exception and which is now designated as No. 51 which has to do with the absence of the same counsel at other times during the trial of the case and will be considered in connection with that bill.
Bill No. 50 has reference to the same statement made by J. D. Dowdy as was discussed and passed on in Bill No. 43. It was taken at the time Deputy Sheriff Holt was testifying concerning the same statement. There is no merit in this bill.
Bill No. 51 was not reserved during the trial of the case but the issue raised was presented in a motion for a new trial which was overruled. The basis of the motion is that the verdict of the jury is a nullity because the senior counsel appointed by the Court to represent the accused, Alwine T. Mulhearn, and the only one who had had five years experience in the practice of law, was not present during the course of the trial on the nights of May 16, 17 and 20, 1949, nor was she present at the time the jury returned its verdict on May 20, 1949.
The circumstances regarding her absence on those occasions are related as follows in counsel's own brief: "That prior to the trial of the case the District Attorney intended to stop the trial at five o'clock each afternoon and continue again at nine each morning until the case was completed. The jury expressed a desire to try the case into the night. That it was agreed by all the attorneys, that when possible the case would be tried at night but the said, Alwine L. Mulhearn, would not be present, since she was expecting a baby within three or four months of the trial date and her doctor had requested her not to do any work after hours (5:00 p. m. o'clock), and to stop work during the day if she became tired."
The right of an accused in this State "to have the assistance of counsel" is secured under the bill of rights of the Constitution of 1921. See Article I, Sec. 9 of the Constitution. The right is also granted by statute, Art. 142, Code of Criminal Law and Procedure. In case of his inability to employ counsel himself, his right to same is prescribed by Article 143 of the Code which reads as follows: "Whenever an accused charged with a felony shall make affidavit *511 that he is unable to procure or employ counsel learned in the law, the court before whom he shall be tried, or some judge thereof, shall immediately assign to him such counsel; provided that if the accused is charged with a capital offense, the court shall assign counsel for his defense of at least five (5) years' actual experience at the bar."
In this case, as was noted before, these accused were represented originally by counsel who evidently had been employed by them. For some reason counsel withdrew from the case and without request from them and without requiring the affidavit referred to in the article of the Code, the district judge appointed four practitioners at the bar as their counsel to continue assisting them in their defense. Of these four, Alwine T. Mulhearn was the only one with at least five years actual experience at the bar, and the issue is, did her absence from the trial on the occasions and under the circumstances mentioned present a cause for a reversal of the verdict?
The Constitution, as is noted, grants to an accused the right to be assisted by counsel in order to defend himself but makes no mention of counsel's qualification nor does it make any distinction with regard to the crime with which he is charged. Article 142 of the Criminal Code contains practically the same provision as the Article of the Constitution. It is only Article 143 of the Criminal Code which gives the accused the right, in case of his inability to employ counsel of his own selection, and upon his making affidavit to that effect, to have the Court assign counsel and that also makes a distinction with regard to counsel's qualification, depending on the nature of the crime he is charged with. Thus we see that it is not a constitutional right which the accused in this case had, to have counsel with five years actual experience before the bar, but purely a statutory one.
It has been held in numerous cases that the Court need not even appoint counsel unless a request is made for same by the accused. See State v. Hillaire, 216 La. 972, 45 So.2d 360. According to some of the decisions cited, the failure of these defendants to have made the request might even be construed as a waiver of their right to have counsel assigned.
It is not necessary for us to apply the force of these decisions in this case, however, because, as stated before, even in the absence of a request, the Court did assign them counsel and among them there was one who had the required experience. Their rights in this respect, therefore, were fully protected.
The law, as far as we know, makes no distinction between counsel employed by an accused and counsel assigned to him by the Court. After the assignment has been made and accepted, the accused assumes the same position with regard to his counsel as any other accused. See State v. Arbuno, 105 La. 719, 30 So. 163. If the accused in this case had been represented by more than one employed attorney, only one having five years experience at the bar, and through such counsel they had agreed to waive his presence at some stage of the trial, we do not think they could be heard to complain and ask for a reversal of the verdict on that ground and since they are in the same position with counsel assigned to them by the Court, they have no better or greater right of complaint. None of their constitutional rights have been impaired, nor do they seem to have been prejudiced in any manner by the occasional absence of one of their counsel at certain times during the trial. Our observation from the record is that they had all the assistance they could have expected from any counsel whether employed by, or assigned to them.
We deem it appropriate in closing this opinion to commend the zeal with which assigned counsel discharged the difficult task they were called on to perform. The diligent efforts they put forth is no better reflected than in the number of bills of exception reserved by them and the number of pages it took for us to dispose of them in this opinion. Notwithstanding their conscientious service to the Court and their able assistance to the accused, we conclude, for the reasons stated, that there is nothing *512 appearing in this record on which to reverse the verdict of the jury and sentences imposed by the Court.
Judgment affirmed.
McCALEB, J., concurring.
I am in agreement with all of the rulings in this case but not with the obiter dictum that an accused charged with a capital offense is required to request that counsel be assigned to him for his defense. It is my view that the proviso contained in Article 143 of the Code of Criminal Procedure contemplates that, if the accused in a capital case has not employed counsel, it becomes the mandatory duty of the court to "assign counsel for his defense of at least five (5) years' actual experience at the bar."