**UNITED STATES of America ex rel.
Joseph SHEFFIELD**

v.

**Hiram B. WALLER, Sheriff of the Parish
of Franklin, State of Louisiana.**

**Civ. A. No. 4821.**

United States District Court,
W. D. Louisiana, Monroe Division.

Dec. 23, 1954.

Eugene Stanley, J. Charles Collins, Jr., New Orleans, La., Leon A. Picou, St. Francisville, La., for relator.

Fred S. LeBlanc, Atty. Gen., State of Louisiana, M. E. Culligan, Asst. Atty. Gen., State of Louisiana, Harry N. Anders, Dist. Atty., Fifth Judicial District, State of Louisiana, Winnsboro, La., for respondent.

DAWKINS, Jr., Chief Judge.

■ Presented here by an application for *habeas corpus*, we have for decision the question of whether due process of law was done, under the Federal Constitution, in a State court conviction of murder. Jurisdiction exists.[1]

On June 14, 1953, John L. Waller, a deputy sheriff in Franklin Parish, Louisiana, acting in line of duty, was killed instantly by a shotgun blast. Nineteen days later Joseph Sheffield, relator herein, stood convicted of the crime in the State District Court, and was sentenced to death in the electric chair. In that brief interval he had been indicted, arraigned, tried, convicted and sentenced.

Haste was the watchword:

A grand jury was called into special session on June 17, 1953, three days after Deputy Waller was killed, and immediately returned its indictment charging relator with murder. He was a penniless, 24-year-old sharecropper, with a sixth-grade education, ignorant of trial proceedings and unable adequately to understand or conduct his own defense. By 1:30 P. M. the same day, the District Judge had appointed counsel for him, he was arraigned, pleaded "not guilty", and the case was fixed for trial twelve days later, on June 29, 1953. In the early evening of June 30th, after about three hours deliberation, the jury returned its verdict of "guilty as charged", requiring a capital sentence. This was imposed by the judge on July 3rd. Relator has not been executed because, as explained *infra*, the Governor has withheld signing his death warrant.

■ For a thorough exposition of the case, it is necessary that we narrate in some detail the salient facts as they developed from the time of the shooting. Some relate to matters which essentially constitute lack of due process; others to connected pre-trial and post-trial developments, as well as to trial tactics. Together they clearly demonstrate that relator, with whose guilt or innocence we are not here concerned, did not receive a fair and impartial trial, which is his right, and the right of all persons, under the Federal Constitution, Amend. 14.

Unfortunately, no stenographic record was made of the testimony and State trial proceedings, although a qualified court reporter[2] was available in Winnsboro, the Parish seat where the trial was held. Consequently, we have had to depend on the memories of some of those present, and upon meager court minutes, as to what transpired. Likewise, there was a natural but regrettable reluctance on the part of some participants to disclose fully, and with candor, what took place. Nevertheless, we believe we have seen and heard enough to reach some reasonably solid conclusions.

Shortly after the shooting, relator was arrested and placed in the Parish jail at the courthouse in Winnsboro. He has remained there since, except during the hearing on his present application. On the day of his arrest, under questioning

---

1. 28 U.S.C. §§ 2241–2255; State v. Doucet, 199 La. 276, 5 So.2d 894; Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 437, 97 L.Ed. 469. Besides, all parties, and the office of the Louisiana Attorney General, want us to pass upon the case.

2. This lady, who testified that she often takes and reports court or deposition proceedings, has been secretary to the State District Attorney, who prosecuted the case, for several years.

by the District Attorney, he admitted he had fired the fatal shot, but contended in effect that he had done so in self-defense. On further questioning the next day, he withdrew his statements tending to establish self-defense and made a damning confession which was the *coup de grace* at his trial. He had no counsel when these statements were taken.

During the afternoon of Sunday, June 14th, while relator and others were being questioned, a fairly sizeable crowd of about fifty to a hundred persons—coming and going—congregated at the courthouse square. These people were not unruly, however, and no danger of mob violence appeared then or later. Those who came and went expressed a sense of horror that "another" law enforcement officer had been done in, it appearing that several others in the North Louisiana area had been killed in line of duty within a relatively few months. That there was an "open season on peace officers", seemed to be the common sentiment.

On Thursday, June 18th, the weekly "Franklin Sun", the "Reading Habit of Franklin Parish People" and the only newspaper published there, carried a banner headline, front-page story about Deputy Waller's death and relator's arrest. There were pictures of the deputy and of relator in jail. Over relator's picture was a caption which read: "Charged with Murder". Underneath it was the following:

"Joseph O. Sheffield, 24, obliged photographers from The Sun with this photograph in his cell in the Franklin parish courthouse, where he is held on a charge of murder in connection with the fatal shotgun shooting of Deputy Sheriff John L. Waller, 41, near Wisner Sunday afternoon. *He told The Sun he 'guessed' he regretted the fatal incident.* His trial is scheduled to begin Monday, June 29." (Emphasis supplied.)

Over the deputy's picture was the caption: "Officer Slain". Underneath it was the following:

"John L. Waller, 41, of Gilbert, a Franklin Parish deputy sheriff, *was fatally shot with a 20-gauge shotgun by Joseph O. Sheffield,* 24, at a farm house near Wisner Sunday afternoon. The slain officer was buried Wednesday shortly after a grand jury in special session indicted Sheffield on a charge of murder. Trial has been set for Monday, June 29." (Emphasis supplied.)

The banner story of June 18th contained the following language:

"Franklin Deputy Sheriff John L. Waller was buried yesterday afternoon and *his slayer, 24-year-old Joe Sheffield,* goes to trial on June 29 on a charge of *murder.*

"Only a few hours before the 41-year-old officer was laid to rest, a grand jury here in a special session returned an indictment charging the youthful Sheffield with murder in connection with the fatal shooting at a farm home near Wisner Sunday afternoon.

"In *a maximum security cell* of the Franklin Parish jail, *the slayer said yesterday he 'guessed' he regretted firing a fatal shotgun blast into the neck of the officer, but he was not 'losing any sleep' because of the act.*

"*Earlier, he allegedly told officers he 'had a bellyful of being messed with by the law' and shortly before the shooting he reportedly vowed to shoot 'the first law that comes in sight.'*

"Authorities said *Deputy Waller, a brother of Franklin Parish Sheriff Hiram B. Waller,* was slain while investigating 'a disturbance' at the home of J. H. Wilson, Sheffield's step-father, about three miles south of Wisner. Waller reportedly drove to Wisner, picked up Special Deputy Sheriff Homer Hodges and drove to the Wilson home.

"According to authorities, the two officers approached the Wilson home

from the side and were met by Sheffield, who was armed with the .20 gauge shotgun. Hodges, describing the events leading up to the shooting, said Sheffield came up to the officers' automobile and thrust the muzzle of the gun toward Hodges who ducked and told the youth 'not to do that'.

"Officers said Sheffield fired the shotgun at that moment and the charge struck Waller, who was on the opposite side of the vehicle. Waller was climbing out from behind the steering wheel when the charge struck him, Hodges said.

"Hodges said he jerked the shotgun from Sheffield's hand and chased the youth, who dashed inside the farmhouse. Hodges reportedly fired one shot from his pistol at Sheffield, and continued on into the house in pursuit. He said he was met inside the home by Sheffield, who had armed himself with another shotgun. Hodges was quoted as saying he did not fire again because the home 'was full of people'. He then left the Wilson home.

"The deputy was picked up near the scene by a farmer in a truck, who took him to a nearby store where he summoned help." (Emphasis supplied.)

On June 25th, just four days before the trial, a front page story included the following:

"Joseph O. Sheffield goes on trial in the Franklin parish court house Monday morning, charged with the murder of Deputy Sheriff John L. Waller of Gilbert, near Wisner on June 14.

"The 24-year-old prisoner has spent a quiet 10 days in his cell in the parish jail in the courthouse since he was taken into custody *after shooting the 41-year-old officer with a .20-gauge shotgun. He has had few visitors.*

 \* \* \* \* \* \*

"The fatal shooting of *Deputy Waller, a brother of Franklin Sheriff Hiram B. Waller,* occurred at the farm home of J. H. Wilson some two or three miles south of Wisner shortly after noon on June 14.

"The officer had proceeded to the scene of the incident to 'make an investigation of a disturbance' reportedly created there by Sheffield, and picked up Homer Hodges, a state conservation agent, in Wisner. *A 'very few minutes' before the two reached the scene Sheffield reportedly loaded the .20-gauge, single-shot shotgun and in the presence of Mr. and Mrs. Billy Pilgram, declared that 'If they come out here, someone will probably go to hell \* \* \*. If anyone comes out here someone will die'. Both Mr. and Mrs. Pilgram tried to reason with Sheffield, it was stated, advising him not to arm himself, to no avail.*

"After the officer parked the car, Sheffield allegedly walked to the right side of the automobile, holding the gun pointed at the two men inside the car, and fired the weapon. Hodges, who was sitting on the right hand side of the car, ducked and the back of his neck was seared by the load, it was stated.

"The full load struck Waller in the neck, ranging downward into his heart and killing him instantly, it was stated. He fell to the ground near the rear of the automobile.

"Immediately after the shooting, Hodges grabbed the gun and wrested it from Sheffield, who ran through the back room of the house into the middle room with Hodges in pursuit and was reaching for a double-barrel shotgun hanging on the wall when Hodges fired one shot at Sheffield with a pistol and left the scene through the rear door, it was reported.

"As Hodges was leaving, Sheffield armed himself with the double barrel shotgun and pursued him out the back door, *then went to the body of Waller, took the officer's pistol* and took a shotgun from the sheriff's

car, it was reported. He allegedly told a resident of the community who arrived at the scene, '*I shot the Sheriff*' and that the 'game warden' was with the officer and that he 'took off down the road'.

"Sheffield shortly thereafter was arrested by State Trooper W. W. Miller and Winnsboro Marshal Jesse Hodges, surrendering himself 'between a man and a woman, with his hand on the shoulder of each', it was reported. Before his surrender, *he allegedly placed the slain officer's pistol on the ground beside the body* and placed the shotgun back in the automobile.

"An inquest was held early that night by Dr. H. E. Jones, Franklin parish coroner, and the special session of the grand jury which indicted Sheffield was held last Wednesday.

"Deputy Waller was buried in the Central cemetery near Wisner Wednesday afternoon, June 17." (Emphasis supplied.)

There is little doubt that in the Town of Winnsboro (population under 4,000) and the Parish of Franklin (about 36,-000 people), there were few, if any, who didn't know of the shooting almost immediately; and from these news stories knew that relator was charged with having committed it in cold blood, seemingly without any compunctions of conscience.

On June 17th, shortly after the Grand Jury met, the District Judge appointed four lawyers to represent relator. Except for two others who were close relatives of the District Attorney and thus disqualified, these were all of the lawyers in the Parish who had practiced for the minimum of five years required by Louisiana law for appointment in capital cases.[3] Later, these four lawyers invited a fifth, who had practiced only four years, to join them, thus, according to his words, making it "unanimous". In this way the stigma of handling an unpopular cause was broadly and evenly distributed so that what would have been a well-nigh intolerable burden for a few became bearable by the whole eligible Bar.

One of the defense counsel, senior member of the group, met the District Judge in the Clerk's office at the Parish courthouse shortly before relator's arraignment on June 17th. He was told by the judge, in effect, that "You may be considering the time element between arraignment and trial of this case, so I will give you two Louisiana Supreme Court citations in which shorter delays have been approved." Obviously the judge already had discussed with the District Attorney, and had agreed upon, the trial date twelve days later, for as soon as relator was arraigned, on motion of the District Attorney the date of June 29th was firmly fixed. Court was scheduled to adjourn for its summer vacation on July 1st, until September 1st.

 The defense attorney was quoted as having told a special committee of the Louisiana State Bar Association, appointed to investigate the "due process" features of the case, that the judge had said he would not "tolerate" a motion for continuance. This was denied by the lawyer and by the judge in his written certificate filed herein,[4] but we find it unnecessary to decide whether the judge used that exact language. Even if he did not, we believe he clearly and inflexibly conveyed his preconceived views to defense counsel by letting it be known that he anticipated such a motion might be filed, that his mind was closed on the subject, and that he would hold in accordance with the cases he cited.[5] Accordingly, even when the high-

3. Art. 143, La.Code of Crim.Law and Proc., LSA–R.S. 15:143.

4. 28 U.S.C.A. § 2245.

5. Under Louisiana law, this is a matter which addresses itself to the discretion of the Trial Judge. Art. 320, La.Code of Crim.Law and Proc., LSA–R.S. 15:320. His decision will not be reversed ordinarily, unless it is arbitrary and prejudicial. State v. Stone, 189 La. 567, 180 So. 411: "Any arbitrary or unreasonable abuse of such discretion may be reviewed by the proper appellate tribunal

ly inflammatory articles from which we have quoted appeared in the "Franklin Sun" on the next day, June 18th, and again on June 25th, counsel did not consider using them as the basis for a continuance motion or for a change of venue.[6] Instead, they talked with several people in the Parish and, finding no particular sentiment against relator, decided not to file, and did not file, any such motions.

In this manner the judge had his way despite the obvious, serious damage done to relator's cause by these newspaper articles. Whatever may have been the responses of prospective jurors, on *voir dire*, as to the impressions these highly prejudicial news stories had made on their minds, in our judgment they humanly could not have divorced them from their thoughts. Everyone knew relator had admitted his guilt in killing a popular public officer and had showed no remorse for his crime. His conviction was assured.

After canvassing the situation, defense counsel concluded that their only chance to save relator from the electric chair was to make an appeal to the jury for mercy, to ask for a qualified verdict.[7] Yet, their most valuable weapon—time—was not available because they dared not cross the judge in his predetermination. They really had *no* time: time for public sentiment to cool and relax—time to develop effectively relator's unfortunate family background and broken home—time to produce convincing evidence of his apparently uncontrollable, almost pathological temper—indeed, time within which to reassess, calmly and without such inordinate pressure, their own early appraisal of the defenses available. Instead, they were rushed pell-mell into a trial for which they were not, and could not have been, adequately prepared. This is demonstrated clearly by the following circumstances:

The names of thirteen State witnesses were listed on the back of the indictment. Defense counsel thoroughly interviewed only one of them, Homer Hodges. One of the defense counsel talked briefly with two others, but did not question them closely. No others were even contacted. There were three eye-witnesses, Mr. and Mrs. Billy Pilgram and Mrs. Addie Hutson, who lived in Arkansas, about 150 miles from Winnsboro, who never were interviewed. Yet, at the instant hearing Mrs. Pilgram gave testimony about the shooting that would have tended to corroborate a plea of self-defense, in that she claimed the deceased had drawn his own pistol and pointed it at relator before the latter shot him. She said she did not give this testimony at the State Court trial because she had been instructed not to do so, and had been threatened, by the District Attorney, who of course denies it. Instead of personally interviewing the witnesses other than Hodges, defense counsel relied on the accuracy and completeness of written question-and-answer statements taken from several of them by the District At-

---

on appeal"; and improper refusal entitles defendant to a new trial. State v. Egan, 37 La.Ann. 368.

6. Art. 292, La.Code of Crim.Law and Proc., LSA–R.S. 15:292:

"Every application for a change of venue shall be in writing, and shall set out that the applicant has good reason to believe and does believe that by reason of prejudice existing in the public mind, or for some other sufficient cause, described by him, an impartial trial can not be obtained in the parish wherein the indictment is pending; that the application has been made as soon as it could be after the discovery of such prejudice or other cause, and is not for delay, but to ob-

tain an impartial trial. To every application for a change of venue made on behalf of any defendant shall be annexed the affidavit either of the defendant or of his counsel, that all the allegations contained in said application are true."

This, also, is addressed to the Trial Judge's discretion. State v. Roberson, 159 La. 562, 105 So. 621.

7. Art. 409, La.Code of Crim.Law and Proc., LSA–R.S. 15:409:

"In all capital cases the jury may qualify its verdict of guilty with the addition of 'without capital punishment,' in which case the punishment shall be imprisonment at hard labor for life." State v. Henry, 197 La. 999, 3 So.2d 104.

torney. These were shown to the lawyers shortly after their appointment, when they called at his office to discuss a possible plea to a lesser offense, which he refused to accept. No copies of the statements were asked for or furnished to them for use before or during the trial.

■ Throughout the trial, in a courtroom packed with spectators, Sheriff Hiram Waller, brother of the deceased, served in his official capacity without recusing himself for interest as required by the Louisiana Constitution.[8] No motion for his recusation was filed and no objection was made to his serving,[9] although he drew the names of prospective jurors from the box, sat in the witness chair during *voir dire* examination, and was in charge of the jury, either personally or through his deputies, at all times after it was empanelled until its verdict was rendered. By noon of the first trial day only two jurors had been accepted. Sheriff Waller took them to lunch with no one else present. Later, he and one of his deputies took all of the jurors to three other meals. The jury spent the night of June 29th on cots in the air-conditioned Clerk's office at the courthouse, with two of the sheriff's personally appointed deputies in charge of them. No objection was made to any of this. Un-

known to defense counsel, one of the jurors, Lee McMahon, was married to a sister of the wife of another brother of Sheriff Waller and the deceased. This brother and his wife had been killed in a car accident in 1943.

■ The witnesses were not sequestered. Each sat in the courtroom throughout the trial and heard the testimony of all others. To what extent they were influenced we can only guess, but it is obvious that this did not help relator's case. One witness, Mrs. Pilgram, attempted to give testimony at variance with a signed statement she had given the District Attorney on June 16th after being held in jail without charge with her five small children and her husband for nearly two days. The District Attorney pleaded surprise and was permitted to impeach her. No objection was made by defense counsel and no special jury charge on the subject was requested. In fact, no special charges of any kind were sought, covering such possibly mitigating matters as self-defense, the effect on a murder charge of an attempted unlawful arrest for a misdemeanor without a warrant, or upon any other subject that might have been helpful to relator. No evidence was offered for relator. No bills of exception [10] were reserved, or motions for

---

8. Art. VII, § 71, La.Const. of 1921:
"* * * Except in the parish of Orleans, the coroner shall act for and in place of the sheriff, *whenever the sheriff shall be a party interested*, and whenever there shall be a vacancy in the office of sheriff, until such vacancy shall be filled, and if there be no coroner then the district court may make a temporary appointment, but the coroner shall not, during such vacancy, discharge the duties of tax collector." (Emphasis supplied.)

9. Art. 394, La.Code of Crim.Law and Proc., LSA–R.S. 15:394:
"From the moment of the acceptance of any juror until the rendition of verdict or the entry of a mistrial, as the case may be, the jurors shall be kept together under the charge of an officer in such a way as to be secluded from all outside communication; * * *."
23 C.J.S. Criminal Law, § 1352: "The sheriff or his deputy is the proper officer to take custody of the jury * * *

unless he is disqualified from acting in the particular case, by reason of bias or prejudice." (Emphasis supplied.)
See also State v. Towns, 205 La. 530, 17 So.2d 814, 815: "The purpose of the law * * * is to keep the jurors who actually try the case from *any outside influence*." (Emphasis supplied.)

10. Arts. 498 and 499, La.Code of Crim.Law and Proc., LSA–R.S. 15:498 and 499:
498. "The bill of exceptions is grounded on the objection made to the ruling of the court on some purely incidental question arising during the progress of the cause; and involves the correctness of the conclusions drawn by the court from the facts recited in the bill. A bill of exceptions is not necessary, however, when the ruling complained of is the overruling of a motion for a new trial based upon bills of exceptions reserved during the trial."
499. "On the trial of all criminal cases, whenever a bill of exceptions shall be re-

mistrial [11] made at any time. No objections were made to the following trial incidents, although they were bound to have inflamed the minds of the jurors against relator:

■ 1.) A State witness, Deputy Sheriff Travis Bass, who sent deceased to investigate the disturbance at the Wilson home, volunteered this statement, in substance, which he said he made at that time: "I told him Sheffield was dangerous, and to watch out for him. He would kill. He is the same one who bought a box of buckshot for me." Defendant's character had not been placed at issue when this statement was made.[12] The judge did not instruct the jury to disregard the testimony.

2.) Although it was irrelevant, and unnecessary to the State's case, the widow of Deputy Waller, who was not a witness to the shooting, was called to the stand and required to describe, with natural emotion, her last moments with her deceased husband before he left on the mission wherein he was killed.

3.) The coroner already had testified in detail as to the cause of Deputy Waller's death and the direction taken by the gunshots into his body. There was no issue as to this. Yet, the State called the undertaker as a witness and had him display to the jury the bloody shirt deceased was wearing when he was killed. This clearly was unnecessary to the State's case, and was done to prejudice the jury.[13]

Defense counsel made no post-trial motions and did not appeal.

We have described these events, these serious omissions, not for the purpose of criticizing unduly the sincerity, trial tactics or lack of zeal on the part of defense counsel, but to show, as we must, the whole pattern of developments which apparently overwhelmed them, and which combined to practically guarantee relator a seat in the electric chair. We daresay no lawyer has ever tried a case where he could not find in retrospect that he had done things which he should not have done, or that he had failed to do things which he ought to have done. It is not for us to "second guess" them in passing upon these matters, and we will not do so. We are sure they acted in good faith, considering the extreme pressure under which they were forced to proceed. Nevertheless, when this whirlwind affair is viewed in its entirety, there is no doubt left that relator did not receive a fair trial, in keeping with the

served to the ruling on any objection, the court shall at the time and without delay order the clerk or the stenographer to take down the facts upon which the objection and the ruling are based, together with the objection, the ruling and the reasons of the ruling, which statement, objection, ruling and reasons, so taken down, shall be preserved among the records of the trial, and shall, when signed, by the judge, constitute the bill of exceptions; provided that whenever a bill has been reserved the judge may be coerced by mandamus to sign the same."

Bills of exception *must be reserved*, or errors cannot be reviewed on appeal. State v. Baptiste, 108 La. 586, 32 So. 461; State v. Gains, 169 La. 141, 124 So. 672; State v. Malazza, 177 La. 995, 149 So. 885.

11. Art. 397, La.Code of Crim.Law and Proc., LSA–R.S. 15:397:
"The judge may, without the consent of the defendant, discharge the jury though no verdict has been rendered, and

order the entry of a mistrial, whenever satisfied after the jury has deliberated, that the jurors will be unable to agree, or whenever any cause exists which would warrant the setting aside of the verdict were the case allowed to go on and a verdict to be rendered."

12. "The state is permitted to introduce testimony of the bad character of the accused *only in rebuttal* of the evidence introduced by him to show good character." Art. 481, La.Code of Crim.Law and Proc., LSA–R.S. 15:481. (Emphasis supplied.) It is reversible error to admit evidence as to bad character, when defendant's reputation has not been put at issue. State v. Suire, 142 La. 101, 76 So. 254; State v. McBeth, 167 La. 324, 119 So. 65; State v. Savoy, 170 La. 803, 129 So. 209; State v. Rives, 193 La. 186, 190 So. 374.

13. State v. Morgan, 211 La. 572, 30 So. 2d 434. Cf. State v. Dowdy, 217 La. 773, 47 So.2d 496.

high standards required by American justice.

Soon after sentence was imposed, at the behest of relator's mother, various Franklin Parish citizens, impressed by the great haste employed in the proceedings, sent petitions to the Governor of Louisiana asking him not to sign relator's death warrant. Later, on December 5, 1953, the Board of Governors of the Louisiana State Bar Association,[14] after an investigation, adopted a resolution seriously questioning the lack of due process features of the case and requesting the Governor to withhold execution of the warrant until the courts had passed on the case. The Governor complied.

On December 19, 1953, one of relator's present counsel, who are serving voluntarily and without compensation, mailed to the Clerk of Court of Franklin Parish a motion for a new trial, in which were urged virtually the same grounds upon which the present application is based. On December 24, 1953, the Clerk returned the papers to him unfiled, advising that he had been instructed to do so by the District Judge, "for the reason that same was filed too late". On January 29, 1954, relator applied through present counsel to the Louisiana Supreme Court for writs of certiorari, mandamus and prohibition, making the same allegations as to lack of due process and appealing for relief to that Court's supervisory jurisdiction. On February 15, 1954, in a *per curiam* decision mentioning only the delay provisions of the Louisiana Code of Criminal Procedure, and not touching in any way upon the constitutional questions presented,[15] the application was denied. A petition for a writ of certiorari then was filed in the United States Supreme Court. On October 14, 1954, the petition was denied in the following language: "The petition for writ of certiorari is denied without prejudice to petitioner to apply to the appropriate United States District Court for a writ of habeas corpus."

The present application was filed on November 3rd and heard during nearly four days of testimony, beginning on November 30th.

■ A multitude of Federal decisions, as to what is or is not due process of law, may be found in the Reports. We have studied most of them, especially those cited by diligent counsel for relator and respondent here. The Supreme Court also has decided, however, that no set of inflexible standards may be established by which it can be determined, under the Fifth or Fourteenth Amendments, whether there was due process of law in any given case. Rather, each must be adjudicated on its own peculiar facts, after a long, hard look at the whole picture presented:

"* * * Due process of law is secured against invasion by the federal Government by the Fifth Amendment and is safeguarded against state action in identical words by the Fourteenth. The phrase formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. *Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case.* That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial. In the application of such a concept, there is always the danger of falling into the habit of formulating the guarantee into a set of hard and fast rules the application of which in a given case may be to ignore the qualifying factors therein disclosed." (Emphasis

14. An integrated Bar. LSA–R.S. 37 :211 et seq.

15. The Court could have granted the relief sought, by ordering a hearing on the due process questions in the lower court. Art. VII, §§ 2, 10, La.Const. of 1921. State v. Doucet, 199 La. 276, 5 So.2d 894.

supplied.) Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L. Ed. 1595.

Looking, therefore, to the "totality of facts" in this case, as related above, we conclude that Joseph Sheffield did not receive due process of law. It was denied him at nearly every step of the proceedings. If we were to allow his conviction and sentence to stand, we would be compounding violation of his constitutional rights, no matter how guilty and deserving of punishment he ultimately may be adjudged. Due process is for the guilty as well as the innocent.

Accordingly, unless the State grants him another trial—a fair trial—within six months from the finally effective date of the decree to be entered herein, we will order that he be discharged and released.[16]

Proper decree should be presented.

---

16. 28 U.S.C. § 2243, last paragraph; Dowd v. United States ex rel. Cook, 340 U.S. 206, 210, 71 S.Ct. 262, 95 L.Ed. 215; Mahler v. Edy, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549.